*Crystal Linton, et al. v. Consumer Protection Division*, No. 33, September Term, 2019

(1) **Individuals who had assigned structured settlement benefits filed a class action against the assignees of those benefits seeking civil damages on the ground that the assignments were the product of fraud on the part of the assignees. (*Linton* action*). Prior to the filing of that action, the Consumer Protection Division of the Attorney General's Office (CPD) had sued the assignees for violations of the Consumer Protection Act seeking civil penalties, injunctive relief, and disgorgement/restitution. The Federal Consumer Financial Protection Bureau (CFPB) filed a similar action in the U.S. District Court.**

(2) **While the CPD and CFPB actions were pending, the *Linton* action parties reached a settlement that would have paid the plaintiffs only about four percent of the economic value of the benefits they assigned and would have not only precluded them from receiving any benefits from the CPD or CFPB actions but assigned anything collected by CPD or CFPB to the defendants who defrauded them and purported to require CPD and CFPB to dismiss their actions. Over CPB's objection, the Circuit Court confirmed the settlement class and approved the settlement out of concern that the defendants had little in the way of assets, which were being depleted by the litigation.**

(3) **The Court of Special Appeals reversed that judgment on the ground that it was impermissible for private parties in a settlement of their case, to interfere with the ability of CPD or CFPB to pursue statutory remedies in their cases, including disgorgement/restitution. On cross petitions for *certiorari*, the Court of Appeals agreed that a settlement with those conditions was impermissible.**

(4) **In its Opinion, the Court of Appeals discussed the difference between civil damages and disgorgement/restitution and held that the latter, which involves stripping the wrongdoer of ill-gotten gains, had a public purpose apart from merely compensating individual victims. The Court directed that the case be remanded to the Circuit Court for further proceedings.**

Circuit Court for Baltimore City
Case No. 24-C-16-003894
Argued: January 6, 2020

<u>IN THE COURT OF APPEALS</u>

<u>OF MARYLAND</u>

No. 33

September Term, 2019

_____

CRYSTAL LINTON, ET AL.

vs.

CONSUMER PROTECTION DIVISION

_____

Barbera, C.J.
McDonald
Hotten
Getty
Booth
Battaglia, Lynne A. (Senior Judge,
Specially Assigned)
Wilner, Alan M. (Senior Judge,
Specially Assigned)

_____

Opinion by Wilner, J.
Hotten, Getty and Booth, JJ., dissent

_____

Filed: March 3, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This is a class-action lawsuit filed on behalf of 100 individuals who had assigned structured settlement annuity benefits they were entitled to receive from various tortfeasors to petitioner Access Funding, LLC or its affiliates or designees (collectively "Access"). The lawsuit, which we shall refer to as the *Linton* action, was filed in July 2016 in the Circuit Court for Baltimore City and is based on allegations that the assignments were the product of fraud on the part of Access.

There were several strains to the claim of fraud, but, most prominently, it was based on evidence of a *modus operandi* in which (1) most of the assignors were young victims of lead paint poisoning whose ability to understand the economic impact of the assignment was severely limited; (2) those individuals were actively solicited by Access; (3) as a condition to implementing an assignment of structured settlement benefits, Maryland law requires approval of the proposed assignment by a Circuit Court but prohibits a court from approving an assignment unless the assignor has received "independent professional advice regarding the legal, tax, and financial implications of the transfer" (Md. Code, § 5-1102 of the Cts. &Jud. Proc. Article (CJP)); (4) independent professional advice means advice from a licensed professional adviser who is engaged by the **assignor** and is not affiliated with or compensated by the **assignee** (CJP § 5-1101(d)); (5) most of the assignments at issue involved an Access agent posing as an independent professional adviser who gave no

(or wholly inadequate) independent advice to the assignors; and (6) the amount paid for the assignment of benefits was unconscionably inadequate.[1]

The ultimate issue before us is whether the Circuit Court erred in certifying a settlement class and approving a settlement reached by the parties with respect to that class. Resolving that issue requires consideration of several sub-issues arising in large part from the fact that there were two other actions pending against Access by Government regulatory agencies for the same alleged misconduct, one by the Consumer Protection Division of the Maryland Attorney General's Office (CPD), and one by the Federal Consumer Financial Protection Bureau (CFPB). In the end, we shall conclude, as did the Court of Special Appeals, that the Circuit Court erred in approving the proposed settlement and shall direct that the case be remanded to the Circuit Court for further proceedings in accordance with this Opinion.

---

[1] In its unreported Opinion in this case, the Court of Special Appeals accurately summarized the evidence regarding this activity as follows (2019 WL 1770524, April 2019):

"When people responded to Access's ads, Access referred them to Charles Smith, a lawyer . . . In their petitions for approval of the transfers, Access represented that Mr. Smith had provided the transferors with independent professional advice. In fact, Access had paid Mr. Smith for each victim he 'advised,' more than $50,000 overall . . .. Mr. Smith also practiced law with Access's former attorney, Anuj Sud. None of this was disclosed by Access to the targets of the offers." The Court of Special Appeals also noted that, between 2013 and 2015, Access "obtained judicial approval to acquire 163 structured settlements from 100 victims and obtained $33.8 million in future payment rights (with a present value of $25.5 million) in exchange for $7.7 million in cash." A fuller exposition of the fraudulent activity alleged on the part of Access is set forth in the Complaint filed in this case. Access has consistently asserted, including in the Stipulation of Settlement, that it acted properly in all respects. That is not an issue presented in this appeal.

2

## PROCEDURAL BACKGROUND

In May 2016, two months before the filing of the *Linton* action, CPD, alleging the same misconduct, had filed an enforcement action under the State Consumer Protection Act (Md. Code, Commercial Law Article (CL) Title 13), against Access in the same court. CPD's Complaint alleged that, in soliciting and consummating the assignments, Access engaged in unfair or deceptive trade practices in violation of CL § 13-303. In that action, in addition to civil penalties, CPD sought to enjoin Access from continuing their alleged misconduct, to restore to the assignors the future stream of structured settlement payments, and to compensate them, through restitution and disgorgement, for the value of the structured settlement payments that had been assigned and already paid to Access. We shall refer to that as the *CPD* action.

Six months after the *Linton* action was filed, the Federal Consumer Financial Protection Bureau (CFPB), chartered by Congress to enforce the Consumer Financial Protection Act of 2010 (12 U.S.C. §§ 5511, 5497(d), and 5565), filed a similar action against the same defendants, for the same misconduct and seeking essentially the same relief, in the U.S. District Court (*CFPB v. Access Funding,* No. 1:16-cv-03759-ELH (D.Md.)) We shall refer to that action as the *CFPB* action. In December 2019, the District Court stayed the *CFPB* action pending a decision by the United States Supreme Court in *CFPB v. Seila Law LLC*, 923 F.3d 680 (9th Cir. 2019), *cert. granted* 140 S. Ct. 427 (2019).[2]

---

[2] The *Seila Law* case involves a challenge to the constitutionality of CFPB's appointment structure and not directly to its enforcement powers.

Although all three actions seek similar kinds of relief with respect to the victims – compensation for their losses due to the fraudulent activities of the defendants – the bases for seeking that form of relief and the nature and amount of relief sought are not entirely the same. The *Linton* action is founded on Maryland common law causes of action for civil damages; the *CPD* and *CFPB* actions are based on Maryland or Federal consumer protection statutes that permit the recovery of restitution and the disgorgement of funds received by the defendants through their statutory misconduct. They are not common law actions personal to the individual plaintiffs.

Access moved to dismiss the *Linton* action and to compel arbitration. That was based on the existence of arbitration clauses in each of the assignment transfer agreements. The court took note of that argument, but never directly ruled on the motion. Instead, in September 2016, the parties asked for and received a stay of further proceedings in the *Linton* case for two months and, without any formal discovery, proceeded during that period to negotiate a settlement, in part with the assistance of mediation. On March 28, 2017, while the *CPD* and *CFPB* actions still were pending, the parties in the *Linton* action filed a joint motion for preliminary approval of a class action settlement.

The settlement class was to consist of all individuals who, between January 1, 2012 and July 6, 2016, transferred structured settlement payment rights obtained in settlement of a personal injury claim to Access. It was estimated that there were 100 such individuals. The total gross payout by Access, taken entirely from indemnity insurance policies, would

4

be $1.1 million, of which $330,000 would be paid to Class Counsel as attorneys' fees. Of the balance, the Class Administrator would receive "the reasonable costs of class notice and administrative expense and taxes," for which no estimate was then given, and each of the two named plaintiffs would receive $500 as a service award. Whatever was left would be distributed to the estimated 100 class members on a *pro rata* basis set forth in the Stipulation of Settlement.

The Stipulation of Settlement took account of the pending *CPD* and *CFPB* actions and effectively precluded the settlement class plaintiffs from receiving any benefit from those actions. It did this through a combination of six provisions:

(1) Section 1.15 defined the term "released claims" as "all claims," (A) whether based on Federal or State law, statutory or common law, or were class or individual in nature, (B) that arose out of or were related to the assignments to Access, (C) that were or could have been asserted in the class action, (D) that arose out of equitable or legal remedies, whether by way of damages, recoupment, disgorgement, or avoidance of the assignments, (E) that may be obtained by CPD or CFPB in their actions. In short, it covered any funds or property that either agency might recover from Access for the benefit of a settlement class member.

(2) Under Section 3.1, each settlement class member who had not opted out of the settlement, including the member's heirs, spouses, successors, and assigns, would forever release and discharge all released claims against all released parties, which include not only the entities named as defendants but the principals in those entities as well.

5

(3) Section 3.2 provided that the settling plaintiffs would be enjoined from receiving "any benefits" from "any lawsuit" arising out of or related to any of the released claims.

(4) Section 3.3 required each settling class member to "irrevocably sign and transfer to the Defendants [Access] any and all benefits or recoveries, including any recovery based on the equitable remedies of restitution, disgorgement of profits or damages obtained by [CPD or CFPB] for the benefit of each Settlement Class Member."

(5) Section 10.1 of the Stipulation permitted **either side** to terminate the settlement if any change to the scope of the release or the amount of the Settlement Fund was made by the court.

(6) Section 10.3 permitted each of the **defendants** (but not the plaintiffs), in their sole discretion, to terminate the settlement if either CPD or CFPB "does not provide, in writing, its agreement to **dismiss** its respective lawsuit with prejudice upon a Final Approval Order or either [CPD] or [CFPB] opposes the Court's Final Approval of the settlement." (Emphasis added). **Dismissal of those lawsuits would preclude not only the pursuit of disgorgement/restitution, but also injunctive relief and civil penalties as well.** [3]

---

[3] The parties have paid little or no attention to § 10.3. Access has argued throughout that §§ 3.1, 3.2, and 3.3 do not preclude CPD from pursuing its "public" remedies, such as civil penalties and injunctive relief, but omits any mention of Access's ability to scuttle the settlement if CPD and CFPB refuse to dismiss their actions entirely, which would foreclose those "public" remedies. As we read § 10.3, Access could refuse to pay anything to the

6

In April 2017 – before any hearing on the motion to approve the settlement – CPD moved to intervene in the *Linton* action and requested a 180-day stay to permit the *CPD* action to proceed. CPD noted that what Access was asking was that CPD's claims be effectively released, something Access had sought through a motion to dismiss in the *CPD* action without success. CPD also complained that the proposed settlement in *Linton* would compensate the plaintiffs less than five percent of what they lost through the assignments while diverting $350,000 (later reduced to $330,000) to plaintiff's attorneys. In contrast, CPD argued that its case, through disgorgement and restitution, offered the plaintiffs a restoration of the full structured settlement benefits that, as the result of extrinsic fraud committed by agents of Access, the plaintiffs had assigned to Access. CPD noted that the *Linton* plaintiffs had undertaken no discovery, whereas it had conducted an eight-month investigation.

Both sides in *Linton* opposed CPD's motion, challenging some of its factual assertions and its claims of what it would be able to achieve through the *CPD* action. In particular, they denied that CPD could achieve through restitution or disgorgement restoration of the structured settlement benefits on the allegation that the judgments approving the assignments were void.[4]

----

plaintiffs unless **all** action by CPD and CFPB was terminated. It has not yet attempted to exercise that authority, but, so long as § 10.3 remains part of the settlement, it can do so.

[4] CPD appeared to be relying on CL § 13-406, which permits a court, in an enforcement action by CPD, to "restore to a person any money or real or personal property acquired from him [or her] by means of any prohibited practice." Because CPD regarded the assignments to have been the product of extrinsic fraud, it regarded them as void and allowed the court to restore to the assignors the stream of benefits that otherwise would

7

In June 2017, the court granted CPD's motion to intervene but deferred action on its motion to stay. That was dealt with after another hearing in July, at which time it was denied. In both the June and July hearings, the court expressed its annoyance with CPD for not proceeding with greater expedition in the *CPD* action. CPD argued, among other things, that the proposed settlement of the *Linton* action was premature – that no discovery of available Access assets by the *Linton* plaintiffs had been conducted and that its own effort to discover assets of Access principals had been thwarted by Access – and that it wanted six months to take depositions and develop relevant information in its own case. The court responded that CPD had that opportunity and that it was unfair to delay a settlement in the *Linton* action, given the effort that had gone into negotiating it.

The court denied the stay, essentially for two reasons. First, it accepted, without any evidence other than counsel's assertions, that Access had sold most of the assignments, that neither it nor its principals had anything more than *de minimis* assets, that the only source of funds for the plaintiffs were insurance policies, and that the amounts available under those policies were dwindling each day as the cases progressed and legal expenses were incurred. Second, the court noted that CPD's argument went to the fairness of the settlement, which was not then before the court, and that CPD would have an opportunity to object to that after the notice of the proposed settlement was sent to the settlement class

---

continue to flow to Access. That is an issue in the *CPD* action and is not directly before us in this case.

8

and opt-out responses were received. Any discovery that it needed could be obtained in the interim.

The last issue raised at the July hearing was the form of Notice that would be sent to the settlement class members. It was agreed that the Attorney General's Office would be consulted with respect to the Notice, particularly with respect to its advisement of the *CPD* action. That became the next contested matter. The *Linton* parties proposed a form, to which CPD objected as inadequate. Some changes were made, but, in its Preliminary Approval Order entered on September 28, 2017, the court approved a form to which CPD continued to object. That Order also preliminarily certified the settlement class, appointed Crystal Linton and Dimeca Johnson (the named plaintiffs) as class representatives, and set a hearing for the following February to consider final approval.

That hearing occurred on February 2, 2018. During the interim, class counsel applied for a counsel fee award of $330,000 and filed a proposed Final Approval Order. CPD filed an opposition to certification of the settlement class and to the settlement agreement. In the *CPD* action, it filed a motion for partial summary judgment that many of the assignments at issue were void *ab initio*. The court signed the proposed final order on February 9. It was docketed four days later.

In that Order, the court made extensive findings and stated its reasons for certifying the class and approving the settlement. It noted that, in June 2015 – 11 months before CPD filed the CPD action – some of the attorneys in the *Linton* action had filed an action on behalf of another assignor, Maryalice Rose, against Access and two of its attorneys for the

9

same misconduct alleged in the *Linton* action. *See Rose v. Smith*, Circ. Ct. Balt. City, No. 24-C-15-002960. That action was dismissed with prejudice, by stipulation, in August 2016. It is not clear whether Ms. Rose received any compensation or, if so, how much. The relevance of that action appeared to be to show that both sides in the *Linton* case had done a good bit of work on the issues prior to filing the complaint in *Linton*. The court also noted that CPD and CFPB had been invited to participate in mediation in *Linton* but had declined.

More to the point in terms of the court's decision, the court relied on plaintiffs' counsel's assertions, based on defense counsels' assertions but no documentary evidence, that the only source of funds to pay damages were one or more insurance policies, which were limited in amount. That led the court to give weight to class counsel's belief that "[b]ased on the risks of going forward with the litigation and the realization that the insurance policies will most likely be depleted long before all the lawsuits are resolved."

Notwithstanding that Access had participated in the litigation for a year-and-a-half, filing motions and responses, attending hearings, engaging in mediation, and negotiating and vigorously defending a global settlement, the court declared that there remained a risk that it might grant Access's still-pending motion to dismiss the case and compel arbitration and that an arbitrator might find that the plaintiffs had waived certification of class action arbitration. In describing the terms of the settlement, the court mentioned the release and waiver provisions contained in §§ 3.1, 3.2, and 3.3 of the Stipulation but made no mention

10

of §§ 10.1 and 10.3 which, as noted, permitted Access to scuttle the settlement and pay nothing if CPD and CFPB refused to dismiss their respective actions.

On December 22, 2017, CPD filed an opposition to the class certification, objections to the proposed settlement, to which it attached materials that had been produced and filed in the *CPD* action, including its motion for partial summary judgment that asserted that most of the assignments challenged in the case were void *ab initio*. CPD argued that the court lacked jurisdiction to approve a settlement that purported to release claims by the CPD in its case against Access without its consent, that the settlement fund was inadequate for a variety of reasons, including that it provided compensation for only four percent of the damage suffered by the plaintiffs, that it provided excessive fees for class counsel, that the settlement process was not fair, and that the settlement was premature. The judge acknowledged that she had not read the motion for summary judgment, although she allowed counsel briefly to explain it. In their submission, CPD offered discovery responses from Access principals, in which they refused to disclose their finances, which the court declined to consider.

On January 12, 2018, plaintiff's counsel applied for an attorneys' award of $330,000, claiming that they had spent about 350 hours in travel, drafting, and negotiating. On February 1, 2018, the plaintiffs and defendants submitted to the court a proposed 32-page judicial opinion containing findings of fact and conclusions of law, certifying the class, granting final approval to the settlement, and awarding the requested $330,000 in attorneys' fees, which the court adopted almost verbatim. The final order, essentially in

11

the form submitted, was entered on February 13, 2018. It had immediate effect on the *CPD* action. After approval of the settlement in *Linton*, the defendants in the *CPD* action moved for summary judgment, which, six months later, the court granted based on its conclusion that CPD's claim for restitution was barred by *res judicata.* The court did allow the claims for injunctive relief and civil penalties to proceed. That case, in its very narrow form, is now awaiting trial. This appeal was noted on February 22. A second notice and cross appeal were filed on March 8.

In an unreported Opinion, over a dissent, the Court of Special Appeals affirmed in part and reversed in part the judgment of the Circuit Court. Addressing a cross-appeal by Access, the Court held that the Circuit Court correctly allowed CPD to intervene in the *Linton* action and concluded that, overall, the settlement was **procedurally** fair. It did not rule on whether the settlement was **substantively** fair. The Court's dispositive holding was that the settlement improperly interfered with CPD's and CFPB's enforcement authority: "And because the settlement effectively preempted a major portion of the pending claims being pursued by[CPD] and [CFPB] when it assigned any benefit from those actions to Access and the Class Defendants – *i.e.*, the targets of the agencies' enforcement efforts – the judgment approving the settlement must be reversed." In reaching that conclusion, the Court found persuasive the decision of the Eleventh Circuit Court of Appeals in *Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413 (11th Cir. 1998). The effective judgment of the Court of Special Appeals was a remand for further proceedings.

In dissent, Judge Berger disagreed with the Majority's analysis and concluded that, although the settlement did preclude CPD from "extracting greater payments for the personal benefit of the Class Members," it did not prohibit CPD from protecting the public interest by levying civil and criminal penalties and issuing "a general order of restitution and demand that Access disgorge its rights to future settlement payments."

Neither side was entirely happy with the Court of Special Appeals judgment, and we were presented with cross-petitions for *certiorari*. We granted Access's petition to consider the one question raised in it: "May class members lawfully release and assign to others their right to receive money or property sought for their benefit by [CPD] or [CFPB] through those agencies' separate enforcement actions under the [Maryland Consumer Protection Act] or the [Federal Consumer Financial Protection Act]?" We shall address that question in the context of the facts recited above. We granted CPD's petition to consider whether the settlement was procedurally and substantively fair.

## DISCUSSION

### The Access Petition

The Consumer Protection Act provides an array of options in enforcing the Act, some of them punitive in nature, designed to protect the public at large by punishing the wrongdoer, some designed more particularly to benefit individual victims of statutory violations, some having a dual purpose, depending on the circumstances. In the first category are civil penalties against "merchants" who violate the Act (CL § 13-410) and criminal penalties (CL § 13-411). In the second category is § 13-408, permitting a victim

13

to bring his or her own civil action for damages. That, of course, is what the *Linton* plaintiffs did, although they did not base their case on the Consumer Protection Act. As noted, their Complaint alleged only common law actions – negligence, negligent misrepresentation, fraud, and civil conspiracy.

In the third category are remedies that CPD may pursue both to protect the public, directly or indirectly, **and** to provide relief to individual victims. CL § 13-406 permits the Attorney General to sue for an injunction to prohibit persons from continuing to engage in violating the Act, which can aid both the public and one or more individual victims, depending on what is sought to be enjoined. Section 13-406(c) permits the court, in addition to providing injunctive relief, to "restore to **a person** any money or real or personal property acquired from [the person] by means of a prohibited practice" (Emphasis added). Although there is an indirect benefit to the public from that provision in terms of inflicting some economic pain on the violator, which, depending on the circumstances, could be substantial, it clearly is designed as well to benefit individual victims.

Another option with a similar dual purpose is provided by CL § 13-403(b)(1). Subsection (b)(1)(i) permits CPD, as part of a cease and desist order, to order the violator "to take affirmative action, including the restitution of money or property." Restitution also is provided for in subsection (b)(1)(ii), which allows the cease and desist order to contain any stipulation or condition listed in § 13-402(b). That section permits an assurance of discontinuance or settlement to include a condition for the violator to "[m]ake

14

restitution to the consumer of money, property, or other thing received from the consumer in connection with a violation or alleged violation" **and** "to [p]ay economic damages."

The underlying premise of Access's argument is that all of those remedies that permit CPD to recover money or property for the individual victim are essentially the same, whether designated as damages, restitution, or restoration, and that any money collected by CPD actually belongs to the individual victim. From that premise, it contends that two things flow, the first of which is that victims have a right to choose which remedy they wish to pursue and have the concomitant right to waive a recovery of any or all of them which, through §§ 3.1, 3.2, and 3.3 of the Stipulation of Settlement, they chose to do. Their second point is even more preclusive – that plaintiffs have no **right** to double recovery, and, if they choose to accept their *pro rata* share of what would be left of the $770,000, that is all that they are entitled to by law; they are not **permitted** to recover more.

Access acknowledges, at least in theory, that private parties who seek their own remedy in the form of damages have no authority to preclude CPD from seeking injunctive relief or civil or criminal penalties against violators, although §§ 10.1, 10.2, and 10.3 of the Stipulation of Settlement cast considerable doubt on that concession, but by equating restitution and civil damages, it remains firm in its belief that the plaintiffs have a right not only to preclude CPD from seeking anything resembling compensation for them but to require as well that any restitution or damages recovered by CPD be paid to the violators who defrauded them.

15

There is some merit to aspects of the underlying premise that, under the Consumer Protection Act, money collected or property recovered by CPD in the form of disgorgement/restitution, restoration, or damages ordinarily would be for the benefit of persons who were defrauded by, and suffered loss from, the defendant's misconduct, and ordinarily the money or property would be paid over or restored to them. That does not carry the day for Access, however.

The Consumer Protection Act does not mention the word "disgorgement," nor does it define the word "restitution." The connection between those terms was supplied by this Court in *Consumer Protection v. Consumer Pub.*, 304 Md. 731 (1985) (hereafter *Consumer Pub.*), in which the Court first explored in any depth the purpose and meaning of the then-relatively new Consumer Protection Act. One issue raised in the case was whether restitution could be ordered by CPD when there was no evidence of reliance by consumers on the company's misleading advertisements, and it was in that context that the Court looked at what restitution meant and contrasted it with civil damages. In doing so, it aligned itself with the views of Professor Dan B. Dobbs expressed in Dobbs, *Law of Remedies* § 4.1 at 224 (1973):

> "The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep. . .
>
> Restitutionary recoveries often amount to about the same as the plaintiff's losses, and thus serve many of the compensatory purposes served by a

16

damages recovery.  The justification lies, however, in the avoidance of unjust enrichment on the part of the defendant."  304 Md. at 776.[5]

Normally, the Court continued, a plaintiff seeking disgorgement/restitution must show reliance on the misrepresentation.  Relying on cases from Idaho, Washington, Louisiana, and Wisconsin, however, the Court concluded that that requirement is relaxed when that remedy is pursued by a governmental consumer protection agency and that CPD "may include a general restitution provision in a cease and desist order without direct proof of consumer reliance."  304 Md. at 781.

The Court added, however, that some consumers, for whatever reason, may not want or be entitled to any restitution and that, if CPD collected restitution under a general restitution/disgorgement order, it would have to alert individual victims and permit them to disclaim any refund.  *Id.* at 781.  Through that device, the Court assured that CPD was free to pursue a general disgorgement/restitution remedy and yet preserved the right of an individual beneficiary to decline the benefit.

---

[5] Professor Dobbs later updated his 1973 book.  The current version is Dan B. Dobbs and Caprice L. Roberts, *Law of Remedies,* 3rd ed. (2018).  The authors confirm the difference between restitution and civil damages: "Restitution measures the remedy by defendant's gain and seeks to force disgorgement of that gain.  It differs in its goal or principle from damages, which measures the remedy by plaintiff's loss and seeks compensation for that loss."  *Id.* at 374.  They give as a simple example the defendant steals [or obtains by fraud] the plaintiff's watch, which has a value of $30, but which the defendant sells for $40.  The plaintiff's loss and compensatory damage is $30, but a restitution recovery is $40 – the measure of the defendant's unjust enrichment.

This case does not present that situation, or anything close to it. Every member of the Settlement Class, by his or her own admission, is a victim who suffered significant pecuniary loss as a result of Access's fraudulent misconduct. None of them will receive anything approaching significant compensation for that loss from the *Linton* settlement. Thus, there is little or no prospect of a double recovery. Sections 3.1, 3.2, and 3.3 of the Stipulation of Settlement effectively to take away the choice provided for in *Consumer Pub.* and preclude anything approaching even a single recovery.

The principles enunciated in *Consumer Pub.* have been confirmed several times by this Court and applied by the Court of Special Appeals and the U.S. Court of Appeals for the Fourth Circuit *See Consumer Protection v. Morgan*, 387 Md. 125, 164-66 (2005); *Luskin's v. Consumer Protection*, 353 Md. 335, 383 (1999); *Citaramanis v. Hallowell*, 328 Md. 142, 152-53 (1992); *State v. Andrews*, 73 Md. App. 80, 85-86 (1987); and *In re Edmond*, 934 F.2d 1304 (4th Cir. 1991).

For purposes of this case, the critical holding in *Consumer Pub.* is the Court's adoption of Professor Dobbs's distinction between civil damages and disgorgement/restitution. That distinction has become widely accepted and is directly confirmed by Section 3 of the *Restatement (Third) of Restitution and Unjust Enrichment* (2011), the text of which states simply that "[a] person is not permitted to profit by his own wrong." Comment a. to that section notes that that statement "marks one of the cornerstones of the law of restitution and unjust enrichment" and identifies the general principle underlying the disgorgement remedies in restitution, "whereby a claimant

18

potentially recovers more than a provable loss so that the defendant may be stripped of a wrongful gain."

Comment c. to § 3 adds that "[r]estitution requires full disgorgement of profit by a conscious wrongdoer, not just because of the moral judgment implicit in the rule of this section, but because any lesser liability would provide an inadequate incentive to lawful behavior." *See* also *U.S. v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) (confirming the view it had expressed in an earlier case that "[t]he purpose of restitution is twofold: (1) to restore the defrauded party to the position he would have had absent the fraud [citation omitted] (2) and to deny the fraudulent party any benefits, whether or not foreseeable, which derive from his wrongful act").

This concept of the dual fundamental purpose and function of disgorgement/restitution, especially in response to willful consumer fraud, belies Access's argument that it is the mere equivalent of civil damages. It is not.

There is merit to the general proposition that a victim on whose behalf money is collected or property is recovered by CPD ordinarily has the right to disclaim any interest in it and that a double recovery of civil damages exceeding the loss suffered ordinarily is not permitted. As the immediately preceding discussion indicates, however, restitution through disgorgement is not in the nature of civil damages, and a plaintiff **may** recover more than his or her actual loss. Apart from that, because restitution through disgorgement has a punitive element to it, it partakes of a public remedy, not just a personal one, especially when pursued by a government agency authorized by statute to pursue it.

19

It is implicit from the structure and breadth of the Consumer Protection Act, especially as interpreted in *Consumer Pub.*, that, although consumers who have not been harmed by a defendant's misconduct or who sue in their own right to recover damages for injury suffered have a right to disclaim any recovery on their behalf by CPD, they have no authority, through a private settlement, whether or not approved by a court, to preclude CPD from pursuing its own remedies against those who violate the Consumer Protection Act, including a general request for disgorgement/restitution. That is what §§ 3.1, 3.2, 3.3, 10.1, 10,2, and 10.3 expressly purport to do and what the court, by holding that CPD's claim for disgorgement/restitution in the *CPD* action was barred by *res judicata*, held that they did do.

It follows from these conclusions that §§ 3.1, 3.2, and 3.3, though not necessarily unlawful, are unenforceable. The parties can agree, if they wish, not to accept any compensation from recoveries by CPD, provided there is an adequate disclosure of the prospect that there may be such recoveries through remedies not sought in the *Linton* action. With respect to recoveries through disgorgement/restitution, however, they cannot preclude CPD from pursuing such remedies or direct that any such recoveries be handed over to Access or anyone else (other than the settling plaintiffs), which would directly contravene the statutory authority of CPD to sanction Access for its wrongful conduct. *Cf. Herman v. South Carolina Nat. Bank*, *supra,* 140 F.3d 1413 (11th Cir. 1998). That alone requires that the Circuit Court's approval of the Stipulation of Settlement be reversed.

20

**CPD's Petition**

This case will have to be remanded to the Circuit Court for further proceedings. If settlement is to be pursued, §§ 3.1, 3.2, 3.3, and 10.3, at least in their current form, must be excised, which may affect whether there will be a settlement at all and, if there is to be a settlement, what its terms may be. The fundamental fairness of the current settlement, which is the nub of CPD's cross appeal, is therefore moot. The Notice to members of the settlement class will need to be revised to reflect any new settlement proposal, and, in determining whether to approve any new proposal, the court will need to consider the substantive fairness of the new provisions, including any award of attorneys' fees.

If the case reaches that stage, the court will need to consider (1) from **evidence**, the current financial status of the defendants, (2) the status of the *CPD* and *CFPB* actions, including whether the partial summary judgment entered in the *CPD* case based on *res judicata* needs to be reconsidered, and what, if anything, the disgorgement/restitution remedies or constructive trusts that may be sought in that case are likely to produce, and (3) whether, by participating in the litigation of this case for three-and-a-half years, most of which was taken up negotiating and defending a settlement of the litigation, Access has waived any right it may have had to arbitration. *See Chas, J. Frank v. Jewish Ch.*, 294 Md. 443 (1982); *Cain v. Midland Funding*, 452 Md. 141 (2017).

**A Response to the Dissent**

Judge Booth's dissent is well-written and presents forcefully the arguments found persuasive by the Circuit Court and by Judge Berger in his dissent in the Court of Special

21

Appeals. Those arguments rest essentially on four assumptions: (1) the settlement approved by the Circuit Court was the best the plaintiffs were likely to get, given the conclusion, devoid of any actual evidence, that the only available funding source was $1,100,000 from one or more indemnity policies that were also funding the defense of the action, (2) it is not likely that CPD was going to recover anything more, or, indeed, anything at all, in its action, (3) the settlement in no way inhibited CPD from pursuing its "public" remedies, and (4) the settling plaintiffs had a right to reject any compensation obtained by CPD.

The problem is that the first assumption is, at best, shaky, the second is pure speculation, the third is incorrect, and the fourth, though correct, is irrelevant.

The "finding" that there was $1,100,000 from one or more indemnity policies available to fund the settlement was based on the settlement being approved and implemented in February 2018. It was understood that the first call on that $1,100,000 was the cost of defense.

We do not know for certain what Access may have spent defending the settlement in the Court of Special Appeals. In this Court, it prepared and filed a 49-page main brief, a 29-page reply brief and appendix to CFPB's amicus curiae brief, and a 37-page reply brief to CPD's cross-appellant's brief. Presumably, they are being paid for those efforts and for any appearances they made in this Court or the Court of Special Appeals, and based on what was asserted in the Circuit Court and this Court, we presume as well that the funds for that have been or will be taken from the $1,100,000. Apart from that, class counsel

22

filed a 44-page brief and a 117-page appendix in this Court, and we presume they will be seeking additional fees for that effort and their efforts in the Court of Special Appeals. Even if the Circuit Court judgment were to be affirmed, what, if anything, will be left out of the $1,100,000 for the settlement class members is most uncertain.

With respect to what CPD may recover, although it is true that the Division, relying on the Court of Special Appeals erroneous holding in *LVNV,* was pursuing the prospect of the court declaring the judgments approving the structured settlement assignments void, as we made clear in our Opinion in *LVNV,* that is not a necessary predicate to success in obtaining other forms of statutory relief (*LVNV Funding v. Finch,* 463 Md. 586, 612 (2019)) which, in this case, may include disgorgement or the establishment of constructive trusts with respect to assignees or principals of Access. Given the lack of any real evidence of what resources were available and the massive fraud that permeated Access's business operation, we are unwilling to simply assume that those assignees were, in fact, innocent bona fide purchasers or that Access's principals do not have assets that can be reached. Those things need to be shown by evidence. We cannot predict that CPD will be successful in its efforts, but neither can the dissent reliably predict failure.

The third assumption overlooks §§ 10.1 through 10.3 of the settlement agreement, which effectively condition the settlement on CPD and CFPB dismissing their actions – dismissing them entirely, including their "public" remedies. That is not just a rejection of further benefits by the settling plaintiffs but a requirement that all action against the defendants cease.

23

**JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS/CROSS RESPONDENTS.**

Circuit Court for Baltimore City
Case No.:  24-C-16-003894
Argued: January 6, 2020

IN THE COURT OF APPEALS
OF MARYLAND

No. 33

September Term, 2019

CRYSTAL LINTON, ET AL.

v.

CONSUMER PROTECTION DIVISION

Barbera, C.J.
McDonald
Hotten
Getty
Booth
Battaglia, Lynne A.
  (Senior Judge, Specially Assigned)
Wilner, Alan M.
  (Senior Judge, Specially Assigned)

JJ.

Dissenting Opinion by Booth, J.,
which Hotten and Getty, JJ., join.

Filed: March 3, 2020

I, respectfully, dissent.

The terms of the Settlement Agreement, which were negotiated by private counsel after a 10-hour mediation with a senior judge and approved by a circuit court judge after a hearing, did not interfere with the Consumer Protection Division's (hereafter the "Division") enforcement authority. There is nothing in the Settlement Agreement which interferes with the Division's ability to enforce violations of the Consumer Protection Act ("CPA"), Maryland Code (1975, 2013 Repl. Vol., 2019 Supp.), Commercial Law Article (CL), Title 13, against the defendants named in the case of *Consumer Protection Division v. Access Funding, LLC,* No. 24-C-16-002855 (referred to as "*CPD v. Access Funding*"). My concern is that the Majority's holding puts the Office of the Attorney General in charge of settling private litigation between private parties in any case where it believes that it can "do better" for the victim under a public restitution theory in connection with a CPA public enforcement action.

I would hold that the Settlement Agreement is enforceable. In addition, I would hold that the circuit court correctly applied the law and did not abuse its discretion in certifying the class or approving the class action settlement. Because I would reach and address all of the issues set forth in the Division's cross-petition, and I would affirm the judgment of the circuit court, I have set forth additional background below.

### ADDITIONAL BACKGROUND

The devastating effects of lead paint injuries on children are well-known. These injuries often affect the most vulnerable segment of our population. The plaintiffs are individuals who obtained compensation for their lead paint injuries as children. Many

parents and guardians of the children who obtained compensation elected for a structured settlement, so that the funds would be available to meet their children's future needs. A structured settlement is a form of annuity—providing for tax-free, periodic payments. One rationale behind structured settlements is to prevent those with little financial acumen from squandering a lump sum settlement.

In the late 1990s, factoring companies began to target structured settlement recipients by convincing them to enter into agreements to purchase their annuity payment stream for a lump sum amount at a dramatically discounted amount. Richard B. Risk, Jr., Comment, *Structured Settlements: The Ongoing Evolution from a Liability Insurer's Ploy to an Injury Victim's Boon,* 36 Tulsa L.J. 865, 883 (2001). To protect consumers from this practice, the General Assembly enacted the Maryland Structured Settlement Protection Act in 2000. Md. Code (1974, 2013 Repl. Vol. 2019 Cum. Supp.), Courts and Judicial Proceedings Article ("CJ"), § 5-1101, *et seq.* Under the Structured Settlement Protection Act, structured settlement payments cannot be transferred without court approval. CJ § 5-1102. Among other things, the court must find that the transferor "received independent professional advice concerning the proposed transfer[.]" CJ § 5-1102(b)(3). But an adviser is not "independent" if they are, among other things, "affiliated with or compensated by the transferee[.]" CJ § 5-1101(d)(2).

### Access Funding's Structured Settlement Purchasing Scheme

Founded in 2012, Access is a structured settlement factoring company that "offer[ed] [] recipients of structured settlements the opportunity to transfer a portion of their future payment streams in exchange for a discounted lump sum." *Consumer Fin. Prot. Bureau v. Access Funding, LLC*, 281 F. Supp. 3d 601, 603 (D. Md. 2017) (quotation marks

2

omitted) (citation omitted). The Class Members are individuals who received structured settlement annuities as the result of lead paint exposure claims and/or cases in Baltimore City. Subsequent to the resolution of their lead paint claims and cases, the Class Members, many of whom suffer from cognitive deficits and other brain impairments, were lured by Access into selling their structured settlement annuity contracts for grossly unfair and unconscionably low sums. Access specifically targeted the lead paint settlement recipients and engaged in unlawful sales tactics, which included sending unsolicited advertisements by mail, promising vacations, and giving the recipients gifts.

From June 2013 through June 2015, Access employed Charles Smith to serve as the "independent professional advisor" in each such transaction. In their petition for approval of the transfers, Access represented that Mr. Smith had provided the transferors with independent professional advice. In fact, Access paid Mr. Smith for each victim he "advised," which according to the Division, resulted in overall payments of $50,000. Mr. Smith also practiced law with Access's former attorney, Anuj Sud.[1] Mr. Smith's relationship with Access was not disclosed to the courts approving the transfers, nor was it disclosed to the transferors. The above-described actions resulted in the Circuit Court for Baltimore City entering over 100 enrolled judgments approving structured settlements that were transferred to Access.

Access, in turn, sold the structured settlements as securities to 67 bona fide purchasers for value. These third-party purchasers are located throughout the country, and include independent investors, investment groups, and trusts located in 17 states.

---

[1] Mr. Sud has since been disbarred. *Att'y Grievance Comm'n v. Sud*, 457 Md. 395 (2018).

*The Rose Litigation and its Aftermath*

In June 2015, Maryalice Rose, a lead poisoning victim, filed a complaint against Mr. Smith and his firm, CES Law Group, LLC, in connection with the sale of her structured settlement to Access. She alleged, *inter alia*, that Smith failed to give her independent professional advice as required under the Structured Settlement Protection Act. Ms. Rose was represented by Mr. Brown, Ms. Barron, and Mr. Marshall—the same attorneys representing the Class in this case.[2] Two months after Ms. Rose's filing, in August 2015, Access's and Smith's tactics received public attention after *The Washington Post* published an article describing Ms. Rose's plight and pending litigation. *See* Terrence McCoy, *How Companies Make Millions Off Lead-Poisoned, Poor Blacks*, The Washington Post (Aug. 25, 2015).[3] Ms. Rose's lawsuit, and the media attention that it generated, prompted changes in the Maryland Rules of Procedure and legislation in the General Assembly to create greater protection for transferors in structured settlement transfers.[4]

---

[2] Class Counsel consists of Raymond L. Marshall and Chason, Rosner, Leary & Marshall, LLC; Leah K. Barron, Brian S. Brown, and Saul E. Kerpelman & Associates; and Byron B. Warnken, Matthew M. Grogan, and Warnken, LLC, Attorneys at Law.

[3] https://perma.cc/M2YH-4L78

[4] In October 2015, the Standing Committee on Rules of Practice and Procedure cited to *The Washington Post* article about Ms. Rose and proposed to this Court, among other things, a new chapter to Title 15 of the Maryland Rules—Chapter 1300, captioned "Structured Settlement Transfers." Standing Comm'n on Rules of Practice and Procedure, 189th Report and Notice of Proposed Rule Changes 2–4, 11 (2015). https://mdcourts.gov/sites/default/files/rules/reports/189th.pdf. Chapter 13 was adopted by this Court and went into effect in January 2016. It requires a more thorough vetting of the "independent professional advisor." *Id.* at 2, 24–26; *see also* Md. Rule 15-1304 (reflecting that the affidavit of the independent advisor must contain specific information about the advisor, seller and the factoring company).

*The Consumer Protection Division Suit*[5]

After the filing of the *Rose* litigation and its attendant publicity, the Division

initiated an eight-month investigation into Access's operations.[6] In May 2016, the Division

The General Assembly enacted legislation to create greater protections for structured settlement sellers. *See* S.B. 734, 436th Sess. (Md. 2016) (summarizing the bill's purpose as addressing the "need to protect payees against deceptive trade practices" by redefining "independent professional advice"); *see also* CJ §§ 5-1101(b), 5-1101.1 (reflecting the new definition and the General Assembly's determination that greater protections for structured settlement sellers are necessary). The 2016 legislation revised the Maryland Structured Settlement Protection Act to require that factoring companies register with and be approved by the Office of the Attorney General, and they must provide the transferors with a detailed disclosure statement featuring more information regarding the terms of the sale. CJ §§ 5-1101–5-1112. Additionally, a new section, CJ § 5-1112, authorizes the Attorney General to promulgate regulations to enforce the Act. This new legislation went into effect on October 1, 2016.

[5] The Majority discusses the federal action that was filed by the Consumer Federal Protection Bureau ("CFPB") against the same defendants for the same misconduct, and seeking essentially the same relief, in the United States District Court for the District Court of Maryland, *CFPB v. Access Funding*, No. 1:16-cv-03759-ELH (D. Md.). This case was filed six months after the *Linton* case was filed. I would not consider the CFPB's position as part of this appeal. The CFPB was invited to participate in the mediation. It declined to do so. The CFPB was notified of the Settlement Agreement in April 2017. The CFPB did not move to intervene or take any action in this case. It did not file any objections at the fairness hearing, and it did not participate in any capacity when this case was pending before the Court of Special Appeals. It was not until the Petitioners filed their briefs in this case that CFPB moved to participate in this case as an *amicus curiae*. In its amicus brief, the CFPB argues for the first time that the settlement "could" interfere with its Civil Penalty Fund. This Court will ordinarily only review issues that have been decided by the trial court and preserved for review. Maryland Rule 8-131(a). Because this issue was not raised below, I will not consider it here, other than to say that I do not read the Settlement Agreement as interfering with or limiting the CFPB's ability to continue to pursue its enforcement action.

[6] I mention the *Rose* litigation, the resulting publicity, the passage of reform legislation, and changes to the Maryland Rules, because a suggestion has been made in this case that Class Counsel are "piggybacking" off the Division's investigations and work. I see nothing in the record to suggest that Class Counsel was riding the Division's coattails. Class Counsel represented 24 of the 100 lead paint victims in their initial settlements and

5

sued Access, its related entities, Access's executives, and Mr. Smith. The Division alleges that Access violated the CPA by failing to inform the victims that it was affiliated with Mr. Smith and that Mr. Smith was not an independent adviser. The Division contends that Access also violated the CPA by converting future rights to payment into cash on grossly unfair terms, and by misleading victims about their rights under Maryland law. The Division asserts three counts against the defendants consisting of: Violations of the Consumer Protection Act (Count One); Request for a Declaratory Judgment (Count Two); and Fraudulent Conveyance (Count Three). In addition to seeking civil penalties and injunctive relief, the Division demands: (1) monetary restitution and restitution of property for the victims; and (2) a declaratory judgment that the transfers were void *ab initio* because they were procured by fraud. Specifically, the Division is requesting that the circuit court "void each judgment entered by a Maryland court from 2013 to 2015 authorizing a transaction between the Access Funding entities and a Maryland consumer." In addition to asking the court to *set aside over 100 enrolled judgments*, the Division requests that the court "restore to each injured Marylander who transferred structured settlement payment rights to the defendants the money and payment rights that were taken through unfair or deceptive trade practices." Notwithstanding the extremely broad relief sought by the Division, it has only named as interested parties 16 of the 67 third party purchasers of the structured settlements.

represented Maryalice Rose prior to filing this class action. It is clear from the record that they undertook their own investigation into the unlawful practices of Access and Mr. Smith, which were completely separate and independent from the Division's investigation.

6

As discussed *infra*, although the Division couches their relief as "restitution," what the Division is really seeking is a rescission of more than 100 enrolled judgments, and a court order turning the clock back and unravelling Access's sales of the structured settlement annuities to bona fide third party purchasers. The Division's efforts on behalf of these victims, while laudable, are *extremely* unlikely to succeed.

### The Instant Class Action

In July 2016, Crystal Linton and Dimeca Johnson (the "Class Plaintiffs") filed this suit against Access on behalf of 100 victims who sold their structured settlements. The class complaint alleges claims of common law negligence, misrepresentation, fraud, constructive fraud, and civil conspiracy against Access, Access Holding, LLC; En Cor. LLC; Reliance Funding, LLC; Mr. Smith; CES Law Group, LLC; Mr. Sud; and Sudlaw, LLC (collectively, the "Class Defendants"). The Class Plaintiffs contend that Access defrauded the victims by representing that Mr. Smith provided independent professional advice, and that Access induced them to sell their structured settlement rights by offering unlawful incentives that were not disclosed in the various circuit court petitions.

In August 2016, Access filed petitions to compel arbitration. It argued that each structured settlement transfer agreement contained a mandatory arbitration provision. The Class Plaintiffs did not oppose the petitions to compel arbitration. Instead, the Class Plaintiffs and the Class Defendants sought a joint stay so that they could engage in settlement discussions. The court issued an order staying the case until November 2016.

During the stay, Class Counsel discovered that Smith and Access were insured by declining limits insurance policies.[7] Altogether, the available insurance coverage was $1.1 million. Given the prospects of substantial litigation and declining insurance policy limits, Class Counsel discussed with counsel for the Class Defendants a potential mediation to preserve the available insurance coverage.

In December 2016, the parties participated in a 10-hour mediation with a senior judge. Both the Division and the Consumer Federal Protection Bureau ("CFPB") declined invitations to participate in the mediation. After the mediation, the Class Plaintiffs and Class Defendants reached a settlement in principle.

In March 2017, the settling parties filed a Joint Motion for Preliminary Approval of Class Action Settlement. The proposed settlement provided, among other things, a settlement fund of $1.1 million, from which Class Counsel would receive $330,000 in fees. The proposed settlement bars the Class from "receiving any benefits from any lawsuit or arbitration proceeding arising out of or related to any of the Released Claims," and requires the Class to "irrevocably assign and transfer . . . any recovery based on the equitable remedies of restitution, disgorgement of profits or damages obtained by [the CFPB or the Division] for the benefit of each Settlement Class Member."

In April 2017, the Division filed a motion to intervene, which the court granted. The Division then filed a motion asking that the court stay the class certification and approval proceedings for 180 days so that the Division could pursue its restitution case.

_____

[7] In a declining limits policy, the available "coverage" is reduced by the insured's litigation attorneys' fees and expenses.

8

The Class and the Class Defendants opposed the motion in separate filings and argued that a stay would exhaust the $1.1 million declining limits insurance policy. In July 2017, after hearing extensive arguments from all parties, the court denied the motion.

Thereafter, the Division submitted objections to the class action settlement notice and the Joint Motion for Preliminary Approval of Class Action Settlement. In September 2017, the circuit court held a hearing to consider whether to approve the settlement preliminarily, and to evaluate the proposed notice. The Division expressed several concerns with the notice. After hearing arguments from each side, the circuit court stated that the notice must "be objective . . . [so that the victims] understand what the settlement involved and what the [Division's] case involved, just the facts, what the options are, and not anyone's recommendation to accept the settlement." The circuit court directed the parties to make several revisions to the notice in response to the Division's concerns. The settling parties later submitted a revised version of the proposed notice.

In September 2017, the court entered a Preliminary Approval Order. The court found that the "'proposed notice constitutes the best notice that is practicable under the circumstances' because it sufficiently described the nature of the class action, the terms and binding effect of the settlement, and each victim's right to opt out." The court approved the proposed opt-out form, certified the class preliminarily, granted preliminary approval of the settlement, and scheduled a fairness hearing for February 2018.

In December 2017, the Division filed a motion for partial summary judgment in its case, *CPD v. Access Funding*, and sought a declaration that the structured settlement transfers were void *ab initio.* The Division also filed a motion opposing class certification

9

and objecting to the proposed settlement in this case. In January 2018, the Division filed a motion to defer the fairness hearing until after its summary judgment motion was resolved. The court permitted the Division to argue its motion at the February 2, 2018 fairness hearing. After hearing arguments of counsel, the court denied the motion and proceeded with the fairness hearing.

At the fairness hearing, the court instructed each party's counsel to present arguments and proffer facts so that it could determine whether the settlement was "fair, adequate and reasonable." The parties presented arguments and representations of counsel. The court asked the parties if the Class Defendants had any money other than the insurance policy to redress the Class's injuries. Counsel for Access represented that Access and its related entities had "no assets" and were "basically insolvent." Counsel for Mr. Smith advised the court that Mr. Smith had sworn in an affidavit that he had only a "few thousand dollars" other than the assets that he held with his wife as tenants by the entireties.

Next, the court inquired into Mr. Sud's financial solvency and ability to pay any damages. Class Counsel stated that Mr. Sud had pleaded guilty to a federal crime and was "facing up to five years [in prison]" in addition to $250,000 in fines and penalties. Initially, the court was not persuaded that Mr. Sud's guilty plea prevented him from redressing the Class's injuries and stated that Mr. Sud "may have $5 million" in assets and could theoretically pay the fines as well as damages. Class Counsel responded that Mr. Sud had a strong defense to the conspiracy asserted against him because he had provided legal advice within the scope of his employment. The Division argued that the court should

10

consider the financial resources of three Access executives who were not defendants in the class action, but the court declined to do so.

The court also considered whether the Class could obtain a more favorable remedy if the court declined to approve the proposed settlement. Class Counsel acknowledged that the class action "might not be successful" because Access's structured settlement transfer agreements contained provisions that obligated Class Members to arbitrate their claims individually and that litigating serial claims would likely deplete Access's declining limits insurance policy. Based upon these facts, Class Counsel contended that the settlement was in the Class Members' best interests.

On February 9, 2018, the circuit court issued a Final Approval Order. In its 28-page Order, the court certified the Class, approved the settlement and awarded Class Counsel $330,000 in attorneys' fees.

## ANALYSIS

### *The Division's Enforcement Tools Under the CPA*

As the Majority correctly notes, the Division has several broad enforcement tools at its disposal under the CPA. Specifically, the Division may: seek an injunction to prohibit a person from continuing to engage in conduct that violates the Act (CL § 13-406(a)); obtain fines as civil penalties (CL § 13-410); and impose criminal penalties in connection with a criminal conviction (CL § 13-411(a)). As part of the Division's authority to seek injunctive relief, it may seek a court order authorizing restitution to those injured by the abusive, deceptive, and unfair trade practices pursuant to CL § 13-406(c): "The court may enter any order of judgment necessary to: . . . (2) Restore to a person any money or real or

11

personal property acquired from him by means of any prohibited practice[.]" In connection with its enforcement action, "the Attorney General is entitled to recover the costs of the action for the use of the State." CL § 13-409.

### Consumer's Remedies Under the CPA and Common Law

Under the CPA, the General Assembly has also established a private cause of action for any person who suffers injury or loss as the result of a prohibited act. CL § 13-408. The statutory cause of action allows an individual to recover damages, and to also recover his or her attorneys' fees. *Id.* The private claim arising under the CPA is, "[i]n *addition* to any action by the Division or the Attorney General," authorized to bring the public enforcement action and is in addition to "any other action otherwise authorized by law." CL § 13-408(a) (emphasis added).[8] In other words, the General Assembly has expressly authorized the Division to bring a public enforcement action with the associated available public remedies and has also authorized individuals who have suffered injury or loss to maintain a private cause of action for damages under the CPA, in addition to any common law remedies available to the private individual. The public statutory enforcement rights and remedies are separate and distinct from the private statutory and common law rights and remedies.

---

[8] In addition to establishing a private statutory cause of action for violations of the CPA, the General Assembly has also provided consumers with a right to seek administrative enforcement by filing a complaint with the Division. CL § 13-401. If a consumer files a complaint, the statute makes it clear that this right is in addition to any other right or remedy to which the consumer may be otherwise entitled. CL § 13-401(e).

Under the express language of the statute, the General Assembly recognizes that there may be dual proceedings—a public enforcement action brought by the Division with all of its available public enforcement remedies at its disposal, as well as a private cause of action under the CPA or under the common law. CL § 13-408(a). In this case, we are brought to a crossroads in which there are two such concurrent proceedings.

### *The Interplay Between Public and Private Remedies*

I agree with the Majority that restitution is a public remedy and is separate and distinct from private damages. In *Consumer Protection Division v. Consumer Publishing, Co.,* 304 Md. 731 (1985), this Court quoted Professor Dan B. Dobbs, *Law of Remedies* § 4.1 at 224 (1973), to explain the difference between damages and restitution:

> The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep . . . .
>
> Restitutionary recoveries often amount to about the same as the plaintiff's losses, and thus serve many of the compensatory purposes served by a damages recovery. The justification lies, however, in the avoidance of unjust enrichment on the part of the defendant.

*Consumer Publ'g,* 304 Md. at 776.

In *Consumer Publishing*, the issue was whether the Division could pursue the remedy of general restitution without direct proof of customer reliance. *Id.* at 781. The Court held that the Division was not required to prove that customers actually relied upon the deceptive or misleading advertisements and that the "Division may include a general restitution provision in a cease and desist order without direct proof of customer reliance."

13

*Id.* However, the Court held that where the Division pursued a general restitution order, it must establish a procedure for individual determinations of consumer restitution claims:

> Although we reject the Company's broad argument that proof of reliance is necessary before a general restitution order may issue, we do recognize that some of those purchasing the Company's products may not have relied on the false impressions created by the advertisements. Some of those consumers may not want refunds . . . . We agree with the cases in other jurisdictions which, under statutes like Maryland's, require that a restitution order provide a procedure for individual determination of consumer restitution claims . . . . The Division may not simply require the mailing of refunds to all Maryland consumers who bought Company products during a certain period. Purchasers should be notified that they may obtain a refund; in order to be entitled to such refund, they should be required to state that they relied on the false impressions created by the advertising. In this way, purchasers who were not deceived will not receive an "automatic" refund.

*Id.* (internal citations omitted). Respectfully, on the issue of restitution claims, I do not interpret *Consumer Publishing* any broader than establishing the following holdings: *first*, that a restitution remedy is separate and distinct from a damages claim; *second*, that the Division does not need to establish actual consumer reliance when seeking a general restitution provision in a cease and desist order; and *third*, for any restitution recovery, the Division may not simply send refund payments to all affected consumers but must set up a process for the consumer to claim their refund. In other words, the consumer *may exercise his or her free choice* to accept the refund or reject it.

I agree that restitution is a public remedy that the Division may pursue as part of a civil action brought under the CPA. I also agree with the Majority that a private party has "no authority, through a private settlement, whether or not approved by a court, to preclude

14

[the Division] [] from pursuing its own remedies against those who violate the Consumer Protection Act, including a general request for disgorgement/restitution." Maj. Slip Op. at 20. However, I disagree with the Majority's conclusion that the Settlement Agreement precludes the Division from pursuing its available enforcement remedies.

### The Settlement Agreement is not Illegal

Respectfully, there is nothing in the language of the Settlement Agreement that limits the Division's enforcement action or otherwise purports to bind the Division. The Settlement Agreement simply precludes the Class Members who have not exercised their right to opt out of the Class from *receipt* of restitution payments if and when such payments are recovered. *See* §§ 3.1–3.3 of the Settlement Agreement. The Class Members in this case should have the right to exercise their free choice to accept the payment that has been negotiated by their counsel as part of the settlement *or* opt out of the Class and rely upon the government's enforcement authority to pursue restitution on their behalf. The provisions of the Settlement Agreement keep those options intact.

In *CPD v. Access Funding,* the Division is seeking restitution of money and property for the Class. Section 3.2 of the Settlement Agreement bars Class Members from "receiving any benefits from any lawsuit or arbitration proceeding arising out of or related to any of the Released Claims." The language of the Settlement Agreement does not preclude the Division from pursuing its claims—it simply precludes the Class Members from *receipt* of payments. As noted above, *Consumer Publishing* confirms that consumers may lawfully reject the restitution payment arising from a public enforcement action under the CPA. *Consumer Publ'g,* 304 Md. at 781. Logically, if an affected consumer may

15

freely choose not to accept payment after the Division obtains a general order of restitution, it follows that the consumer may also agree to release that payment prior to the Division obtaining an order of restitution.

Individual determinations are necessary following a general order of restitution to sort out those consumers who are not entitled to the remedy, such as those "who have already receive[d] reimbursement" for their loss. *State v. Andrews*, 73 Md. App. 80, 88 (1987). As the Fourth Circuit explained in *In re Edmond*, 934 F.2d 1304, 1312 (4th Cir. 1991), the individual determination procedures required by *Consumer Publishing* and *Andrews* for victim-specific restitution "ensure that an individual who received money under a private right to action could not also receive money from the Division's actions for the same injury." (citing *Consumer Publ'g*, 304 Md. at 781; *Andrews*, 73 Md. App. at 87–89; *Attorney General v. Dickinson*, 717 F. Supp. 1090, 1105–06 (D. Md. 1989)); *see also Consumer Prot. Division v. Morgan*, 387 Md. 125, 166 (2005) (interpreting *Consumer Publishing* to hold that the Division may "issue a general order of restitution without proving an individual consumer's reliance, but may not award restitution to the individual consumer without a showing of individual reliance"). As part of a negotiated settlement, a consumer should be permitted to exercise his or her contractual right to waive or release the right to receive such a payment.

These cases are consistent with the application of the one-satisfaction rule to the restitution remedies sought by the Division for consumers under the CPA. This Court recently discussed the one-satisfaction rule in *Gallagher v. Mercy Medical Center*, 463 Md. 615 (2019). In *Gallagher*, the Court reiterated Maryland's reliance on the long-

standing principle that "a plaintiff is entitled to but one compensation for his or her loss, and satisfaction of her claim prevents the plaintiff from pursing another who may be liable for the same damages." *Id.* at 626 (citing *Underwood-Gary v. Mathews*, 366 Md. 660, 667 (2001)). In that case, we held that an injured driver's settlement with her uninsured/underinsured motorist constituted a full satisfaction of her injuries, and therefore the one-satisfaction rule barred her from maintaining a separate medical malpractice action for the same injuries. *Id.* at 620. Simply stated, the rule provides that the "plaintiff is entitled to one compensation for his or her injuries." *Id.* at 626 (citing *Underwood-Gary*, 463 Md. at 667).

The Class Members who voluntarily chose not to opt out of the class settlement have a contractual right to release their right to receive any future payments arising from the Division's restitution recovery efforts through a settlement. The release provisions of the Settlement Agreement simply implement the one-satisfaction rule that the Class Members who do not opt out of the settlement are prevented from receipt of a double recovery for their same injury. The CPA does not preclude private settlements, nor does it negate the one satisfaction rule. There is no reason why the Class Members, represented by Class Counsel, cannot accept settlement payments as full satisfaction for their injuries in exchange for a release of any restitution payments recovered in the Division's case.[9]

---

[9] The Majority also focuses much of its attention on Section 10.3 of the Settlement Agreement, which allowed each of the Class Defendants the right to terminate the settlement if either "the [CFPB] [] or the Division does not provide in writing, its agreement to dismiss its respective lawsuit with prejudice upon a Final Approval Order or either the Division or the [CFPB] [] opposes the Court's Final Approval of the Settlement." I see nothing illegal or wrong with this rather standard condition. This provision gave the Class

17

I also believe that the release and assignment provisions in this negotiated, arms-length settlement agreement are not void for public policy reasons. "Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would . . . pronounce it' invalid." *Md.-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena*, 282 Md. 588, 606 (1978) (internal citations omitted). The Court's reluctance to nullify contractual arrangements on public policy grounds also "serves to protect the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle." *Id.*

In my view, it was not illegal for the Class Members to release their right to *receive* restitution because the release does not, as the Majority holds, preclude the Division from pursuing its own remedies against those who violate the CPA. The release simply bars the Class Members who have elected not to opt out of the settlement from receiving a double

Defendants the right to terminate the settlement *prior to the consummated settlement* if the Division or the CFBP did not dismiss their suit or if they objected to the settlement. Section 10.3 must be read in conjunction with Section 10.6, which sets forth the timing within which a party could terminate the settlement prior to its consummation. Parties often negotiate conditions in a settlement agreement, particularly where court approval is required. Reading Section 10.3 and Section 10.6 together, if the Class Defendants had not exercised their right to terminate the settlement prior to the adoption of the Final Approval Order (and after the expiration of the appeal period), this pre-settlement condition would have been extinguished. In other words, once a non-appealable Final Approval Order was entered and the parties consummated the settlement with the exchange and receipt of the settlement funds, this condition would no longer have any force or effect. Section 10.3 does not give the Class Defendants the ability to rescind a consummated settlement.

18

recovery, consistent with the one-satisfaction rule.  The Division is free to exercise its statutory authority and vindicate public interests by pursuing civil penalties and criminal penalties.  I would hold that where plaintiffs have elected to pursue private remedies, they have the right to release their right to receive public restitution payments for the same injury should the agency recover those sums in a separate suit.

### *A Tale of Two Recoveries*

Respectfully, in my opinion, the real issue in the case is not whether the terms of the Settlement Agreement preclude the Division from taking enforcement action against Access and its agents. Nothing in the Settlement prevents the Division from continuing with its legal claims in *CPD v. Access Funding.*  Rather, the crux of the dispute is that the Division thinks it can negotiate a better deal for the Class Members than Class Counsel. The Division may be able recover more (for the reasons expressed below, I agree with the circuit court judge and share her cynicism).  However, that is not the Division's decision to make for Class Members who have chosen not to opt out of the settlement reached through private counsel.

The class action and resulting Settlement Agreement provided these victims with a choice—to opt out and rely upon the Division to attempt to recover restitution on their behalf, or to accept the payment negotiated through mediation and settlement.  The Class Members were represented by Class Counsel—accomplished lawyers who had substantial experience in handling class actions.  Class Counsel had represented 24 of the 100 Class Members in the underlying cases that gave rise to the structured settlement payment rights at issue in this case as early as 2015.  Nearly a year before the Division filed its civil

enforcement action, Class Counsel filed the *Rose* case against Mr. Smith, Access, and Mr. Sud, asserting the same allegations of misconduct that were raised in this case and the Division's action. As noted in the circuit court order, "Class Counsel investigated, met with, and interviewed clients, and researched causes of actions and defenses to potential claims and prepared the Class Action Complaint for many months before initiating the Class Action."

The parties participated in a 10-hour mediation with a senior judge, which resulted in a preliminary settlement agreement involving the payment of $1.1 million, representing the maximum insurance available under a declining limits insurance policy.

Throughout this proceeding, the Division raised numerous objections at various stages and at four separate hearings before the same circuit court judge. Many of the objections centered on the Division's belief that it can obtain more money for the Class Members. The Class Members had information available to enable them to decide whether to opt out of the Class and take the risk that the Division could obtain more. Specifically, the circuit court judge required revisions to the class notice to ensure that Class Members had the necessary information concerning the class action, as well as the Division's lawsuit. The notice described both proceedings and provided the names and contact information for Division counsel to enable any Class Member to contact the Division if they wanted more information about the Division's lawsuit. The Class Members elected not to object to the settlement and did not opt out of the Class. The Class Members should be entitled to choose their path to recovery.

The Class Members' right of choice is significant given the options presented. To be sure, the settlement is but a fraction of the payment that would be necessary to make them whole for the wrong inflicted by Access and Mr. Smith. However, the settlement provides assurance of some monetary payment to the victims.

On the other hand, the Division's proposal of restitution of money and property to the victims is based upon its request that the circuit court "void each judgment entered by a Maryland court from 2013 to 2015 authorizing a transaction between the Access Funding entities and a Maryland consumer." In addition to asking the court to set aside over 100 enrolled judgments, the Division requested that the court "restore to each injured Marylander who transferred structured settlement payment rights to the defendants the money and payment rights that were taken through unfair or deceptive trade practices." In my view, the Division's relief is inconsistent with the law and unachievable, as a practicable matter, given the subsequent transfers of the structured settlements to bona fide third parties.

In *LVNV Funding LLC v. Finch*, 463 Md. 586, 606–11 (2019), this Court held that a collection agency's failure to obtain a license did not render void judgments entered in favor of the debt collection agencies against a debtor. That case also involved the application of Maryland consumer protection statutes. *Id.* at 595. In rejecting the argument that judgments could be voided where the debt collection agency was unlicensed, this Court explained the importance of having final judgments:

> Judgments, by and large, are meant to be final. Even the court that rendered them has but a limited ability to open and revise them. This is because, as this Court said 141 years ago and has

21

repeated several times since, "[i]t is most desirable of course that there should be an end to litigation, and a judgment is presumed to be a settlement of all matters in dispute in that particular case. . . . By it new rights are acquired and if stricken out other claims may intervene. . . ."

*Id.* at 607 (citing *Penn Cent. Co. v. Buffalo Spring & Equip. Co.*, 260 Md. 576, 584–85 (1971); *Abell v. Simon*, 49 Md. 318, 324 (1878)). This Court further held that "[c]ollateral attacks, whether in the court that entered the judgment or in any other court, are even more severely limited and are permitted only when the court that rendered the judgment had no *jurisdiction* to do so. Indeed, there are few principles of law that are so firmly and consistently entrenched in our jurisprudence, and for good reason." *Id.* at 608. After describing the case law relied upon by the Court of Special Appeals discussing the distinction between void versus voidable judgments, this Court stated that:

> None of these cases, nor any like them, persuade us to depart from the principle we have adhered to for well over a century stressing the importance of preserving enrolled civil judgments from collateral attack on any ground other than the lack of fundamental jurisdiction to render those judgments. This is not a matter of blind adherence to an outmoded judicial policy. *Enrolled judgments create important vested rights that not just the parties, but the entire public, have a right to rely upon.* The District Court clearly had fundamental jurisdiction over the collection actions filed by LVNV, notwithstanding that LVNV had no legal authority to file them, and the two lower courts in this case erred in declaring them void.

*Id.* at 611 (emphasis added).

Applying these principles, it will be extremely unlikely that the Division will obtain the relief that they are seeking on behalf of these victims. The Division's relief would run

22

afoul of our holding in *LVNV Funding* and its pursuit of this speculative relief will certainly deplete the available declining insurance policy limits through litigation costs.

Notably, the Division's assertion to the trial court that they "have a viable legal theory" was based upon the intermediate appellate court's holding in *Finch v. LVNV Funding LLC*, 212 Md. App. 748 (2013), which was subsequently overturned by this Court.[10] Even prior to this Court's holding in *LVNV Funding*, the Division conceded that "*it's true that the relief that we're asking for is extraordinary . . . .*" (emphasis added). Respectfully, the only way that the Division will be able to "restore to the victims the income stream" from the structured settlements is for the Division to travel back in time, and raise the assertions related to Mr. Smith's lack of independent advice prior to the post-judgment transfers to bona fide third party purchasers, who have a vested property interest in the structured settlements. The Division's efforts to overturn over 100 enrolled judgments upon which vested rights were created in third party bona fide purchasers of the structured settlements is simply not realistic.

Even if the Division focuses its efforts on disgorgement of profits as opposed to restitution of property, there is no certainty that the Division will be able to recover more than the amount of the insurance proceeds that are available under the class settlement. The circuit court was aware of the Division's admittedly steep hurdle. At the July 25, 2017

---

[10] This Court's opinion in *LVNV Funding LLC v. Finch*, 463 Md. 586 (2019), was published on April 22, 2019—the same day the Court of Special Appeals issued its unreported opinion below in this case. Therefore, the circuit court and Court of Special Appeals did not have the benefit of this court's holding and analysis when considering this matter.

hearing, when the court denied the Division's motion to stay, the circuit court judge *encouraged* the Division to undertake discovery to support its position that it would be able to recover more assets than the settlement, stating:

> Ultimately, I'm going to have to make a decision on whether or not the settlement is fair, reasonable and adequate. And perhaps at the fairness hearing, you can provide the court with information to show that it's not fair, adequate or reasonable. And maybe after you get these depositions, you will be able to provide the Court with that information. I mean there is a concern that *as you just said[,] it's a high bar*. You know, you've got these great plans. If you could show me that it was very likely that you would be able to get the relief that you are seeking[,] I would stay it. But I just don't know how realistic that is based upon the information that I have.

(emphasis added).

In approving the Final Approval Order, the circuit court was aware that the Division had declined an invitation to participate in the 10-hour mediation that resulted in the settlement, and had declined to conduct any discovery or use its subpoena powers to obtain documents during the nine months between the Division's intervention in this case and the fairness hearing—despite the trial court's suggestion that the Division conduct discovery and present realistic evidence of its ability to recover more than the settlement agreed upon by the parties.

The class action and resulting settlement allows the Class Members to choose between the certainty of the class settlement, or the speculative outcome under the Division's case. The effect of the Majority's holding is to undo the settlement. The declining insurance policy limits will be exhausted by Access's costs of defense, very possibly until the proceeds are depleted, while the Division seeks the discovery that it could

24

have pursued during the nine months between its intervention in this case and the fairness hearing. While the Division attempts to obtain more money and property for the victims, a potential outcome is that the insurance proceeds will be exhausted on the costs of defense, leaving the victims with little or nothing.

Under the Majority's holding, I am also concerned in this case, and for future cases, that we force private litigants into situations where their recovery rights are dependent upon the government's determination of righteousness, and not determined by settlements negotiated by private counsel who are ethically bound to the clients they represent. The Office of the Attorney General and the Division represent the State of Maryland and its citizens, not any individual victim. *In re Edmond*, 934 F.2d 1304, 1311 (4th Cir. 1991) ("Maryland law recognizes that the Act embodies a broad state interest in protecting all consumers, present and future. The Division's authority and interest under the Act extend beyond mere representation of particular individual consumers. When proceeding under the Act, the Division serves a quasi-sovereign interest, the presence of which confers *parens patriae* standing."). By contrast, Class Counsel (or private counsel in any other similar case) represents their client's interests. Class Counsel has an ethical obligation under the Maryland Rules of Professional Conduct to represent their client's interests zealously, and to take direction from the client on matters relating to whether to settle a case. The effect of the Majority's holding is to interfere with the client's right to seek and rely upon counsel of their choosing and puts the Office of the Attorney General in charge in any case where the Office of the Attorney General thinks that it can "do better" for the victim under a public restitution theory in connection with a CPA public enforcement action.

25

Because I would affirm the judgment of the circuit court, I will address the issues raised by the Division in its cross-petition. As set forth below, I agree with the well-reasoned portions of the majority opinion of the Court of Special Appeals that the circuit court did not abuse its discretion in certifying the class, and that the overall the settlement was procedurally fair. I also agree with the well-reasoned dissent of Judge Berger that the settlement was substantively fair. Like Judge Berger, I would affirm the circuit court's comprehensive order approving the Settlement Agreement in its entirety.

### *The Circuit Court did not Abuse its Discretion in Certifying the Class*

In its cross-petition, the Division contended that the Class failed to meet its burden in proving that its attorneys fairly and adequately protected the Class's interests. The party seeking class certification bears the burden of proving that the proposed class meets the following four requirements: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Md. Rule 2-231(b). On appeal, the Division argues only that Class Counsel did not fairly and adequately protect the Class's interests.

To determine whether attorneys adequately represent a class, courts consider, among other things, "the vigor of counsel, experience, and diligence." *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 741 (2000). In finding that the Class Counsel "have the experience and the resource[s] necessary for adequate class representation[,]" the circuit court considered the qualifications of Brian Brown, Esq., Leah Barron, Esq., Byron

26

Warnken, Esq., and Raymond Marshall, Esq. Regarding Mr. Brown, the circuit court observed in the Final Approval Order that he has "been a trial lawyer in private practice for over thirty years [and] has tried lead paint cases in both state and federal court . . . for the past fifteen years." In concluding that Ms. Barron adequately represented the Class, the court relied on an affidavit in which Mr. Brown averred that Ms. Barron "has ten years of experience" and "has represented many clients in class-actions in the past." Concerning Mr. Marshall, the court noted that he "has been selected by his peers for the past three years for inclusion in *Best Lawyers in America* in the area of commercial litigation, and he has been recognized as a *Maryland Super Lawyer*."

Furthermore, the circuit court stated that it evaluated "the work that Class Counsel [had already] done in investigating potential claims" and assessed "the resources counsel ha[d] committed." The court made these findings based on several billing invoices and affidavits. For example, Mr. Marshall provided in an affidavit that by February 1, 2018, his law firm had spent more than 359 hours on the case. Moreover, by the time the court detailed its findings in the Final Approval Order, the court had previously conducted four lengthy hearings and reviewed a number of substantive motions and pleadings. As part of this process, the court observed each attorney's ability to adequately represent the Class. In my view, the circuit court did not abuse its discretion in finding that Class Counsel fairly and adequately represented the Class's interests, and in certifying the Class.

### The Circuit Court did not Abuse its Discretion by Approving the Settlement

This Court applies an abuse of discretion standard when reviewing the circuit court's order approving the class action settlement. *See Shenker v. Polage*, 226 Md. App.

670, 684 (2016). This standard recognizes that "the basis of the certification inquiry is essentially a factual one, and thus, deference is due." *Creveling v. Gov't Emp. Ins. Co.*, 376 Md. 72, 90 (2003).

The Maryland Rules require court approval of class action settlements (*see* Md. Rule 2-231(i)), but they provide no standard for courts to apply. *Shenker*, 226 Md. App. at 682. Therefore, Maryland courts look to Federal Rule of Civil Procedure 23 and federal decisions construing that rule. *Id.* (citations omitted). Federal Rule of Civil Procedure 23 requires that class action settlements be "fair, adequate and reasonable." *Id.* (quoting Fed. R. Civ. Proc. 23(e)). Maryland courts must assess: (1) procedural fairness; (2) substantive fairness; and (3) adequacy. *Id.* at 683–84. "There is a strong presumption in favor of finding a settlement fair." *Id.* at 684 (quoting *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 479 (D. Md. 2014)).

### A. The Settlement was Procedurally Fair

Under Federal Rule of Civil Procedure 23(e), factors to be considered in determining whether a proposed settlement is procedurally fair include whether there was: "(1) [a] court-approved notice to all class members bound by the proposed settlement, (2) a hearing to determine whether the proposal is 'fair, reasonable and adequate,' (3) the parties' statement specifying their agreement, and (4) an opportunity for the class members to object." *Decohen*, 299 F.R.D. at 478 (citing Fed. R. Civ. Proc. 23(e)). In my opinion, there is no question that the parties set forth their settlement terms in the Settlement Agreement or that the Class Members had an opportunity to object.

### 1. The Notice was Fair to the Class Members

I agree with the Court of Special Appeals that the procedure for developing the class action notice was fair, that the opt-out provisions adequately informed the Class Members of what they would relinquish if they accepted the settlement and how they could opt out of the settlement if they chose, and that the timing of the settlement was fair.

"When and how plaintiffs provide notice of a class action is left largely to the discretion of the trial court." *Norman v. Borison*, 418 Md. 630, 662 n.23 (2011). The notice requirements under Federal Rule of Civil Procedure 23 are satisfied so long as "class members [are] given information reasonably necessary to make a decision [whether] to remain a class member and be bound by the final judgment or opt out of the action, though the notice need not include every material fact or be overly detailed." *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) (quotations and citations omitted).

The circuit court held a hearing on the Division's objections to the notice and required that the settling parties draft a new notice based upon some of those objections. I agree with the Court of Special Appeals findings that the revised notice "fairly discussed the nature of the pending class action suit and prospective class, sufficiently summarized the terms and conditions of the settlement, and described in detail the related state and federal actions. . . ." *Consumer Prot. Div. v. Linton*, No. 2609, 2019 WL 1770524 at *10 (Apr. 22, 2019). The notice "informed prospective Class Members that their participation in the settlement would preclude them 'from receiving any financial benefit from the lawsuits brought by the Division or the [CFPB].'" *Id.* (quoting the notice).

Additionally, I agree with the Court of Special Appeals that the circuit court properly rejected the Division's request that the notice include a statement that the settlement amount was allegedly equivalent to only 4% of each prospective member's loss. As noted above, the Division presented no evidence to the circuit court to demonstrate that the amount of the settlement was only 4% of each prospective Class Members' loss. As the Court of Special Appeals correctly noted, the "Division had investigated [the Defendants] for eight months before filing its [C]omplaint" but failed to "offer any evidence refuting the settling parties' assertions." *Id*. at *12. Indeed, "the Division's suit was pending for thirteen months before the Division's motion to intervene was granted, and [the Division] could have submitted evidence between June 15, 2017, the date it intervened, and February 2, 2018, the date of the fairness hearing." *Id.* Despite 21 months of investigation and/or formal discovery, the Division failed to submit any evidence to support or substantiate its 4% claim.

The notice advised the Class Members that by accepting the settlement, they were precluded from "receiving any financial benefit from the lawsuits brought by the Division or the Bureau." It further explained that the Class Members would be releasing Defendants from "further liability, which means that the Defendants cannot be sued again for the transfer of structured settlement payments." The notice clearly informed the Class Members that they were releasing their right to further recovery from Access Funding.

Additionally, the notice provided an opt-out form. The circuit court explicitly mentioned the opt-out form when it approved the form of the content and opt-out form, which was attached as an exhibit to the stipulation of settlement.

I agree with the Court of Special Appeals' rejection of the Division's argument that the opt-out form violated Md. Rule 2-231(e) because it was not "given in the manner the court directs." *Linton*, at *12. The only differences between the form notice approved by the Court and the notice given were "minor formatting alterations" and the fact that the mailing deadline of December 12, 2017 had been inserted—where the deadline had been left blank in the court-approved notice.

## 2. Other Procedural Considerations

The Division contends that the timing of the settlement warrants "judicial skepticism" because it was negotiated without discovery. At the fairness hearing, Class Counsel and counsel for the Class Defendants argued that the settlement was fair and that the amount of the settlement was adequate because the Class Defendants were insolvent, and their insurance policy provided the only source of recovery. The Division asserts that the settling parties' reliance on these factors is improper because the parties did not engage in formal discovery or introduce any evidence.

In assessing whether a settlement "was the result of good faith bargaining at arm's length[,]" courts look at the "posture of the case at the time settlement is proposed, the extent of discovery that has been conducted, and the circumstances surrounding the negotiations[.]" *Shenker*, 226 Md. App. at 687 (cleaned up). Although class action settlement at an early stage may "rais[e] questions of possible collusion[,]" an early settlement may nonetheless be reasonable if the settling parties engage in an "informal discovery" process. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991).

In Maryland, courts "need not 'turn the settlement hearing into a trial or rehearsal of the trial, nor [must they] reach any dispositive conclusions on the admittedly unsettled legal issues in the case.'" *Shenker*, 226 Md. App. at 684 (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172–73 (4th Cir. 1975)). The circuit court need only to have reached "an intelligent and objective opinion on the probabilities of ultimate success should the claim be litigated and form an educated estimate of the complexity, expense, and likely duration of such litigation, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise . . . ." *Id.* at 684–85 (quoting *Flinn*, 528 F.2d at 1173). Indeed, it is "entirely in order for the trial court to limit its proceedings to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Flinn*, 528 F.2d at 1173.

I agree with the majority's analysis in the Court of Special Appeals' unreported opinion, which I can say no better:

> In our view, the court did not abuse its discretion in finding that the timing of the settlement was fair. The suit was filed on July 6, 2016. At the mediation six months later, the Class and the Class Action Defendants exchanged documents and negotiated for ten hours before ultimately agreeing to a settlement in principle (the Division and the CFPB declined invitations to attend). On March 28, 2017—more than three months after the mediation and eight months after filing the complaint—the Class and the Class Action Defendants filed a joint motion requesting the circuit court to approve the settlement preliminarily. The Division correctly points out that the presence of a neutral mediator is not on its own dispositive, but it can be persuasive. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011). And the timing of the settlement was fair and reasonable in light of the Class Action Defendants' declining limits on its insurance policy. Counsel for the Class Action Defendants proffered at various hearings that the insurance policy was a "declining limits" policy, meaning that costs incurred in defending litigation

32

decrease the amount the Class could ultimately receive. In their opposition to the Division's motion to stay settlement proceedings, Access attached a table providing that as of June 19, 2017, Access and its related entities had a policy limit of $1 million and had expended $257,787.37 in defense costs, leaving $754,212.63 remaining to fund the settlement. The court expressed concern at the July 25, 2017 hearing that if it stayed the settlement proceedings, and the Division nonetheless failed to obtain restitution for the Class, "the [insurance] money will be all gone and then the [Class] will be left with nothing."

Although the Division takes issue with the lack of formal discovery process, the Division had investigated Access for eight months before filing its complaint and didn't offer any evidence refuting the settling parties' assertions. The Division's suit was pending for more than thirteen months before the Division's motion to intervene was granted, and it could have submitted evidence between June 15, 2017, the date it intervened, and February 2, 2018, the date of the fairness hearing. In short, the record supports a finding that the settlement was not the product of collusion and that the court did not abuse its discretion in finding that the settlement approval process was procedurally fair.

*Linton*, at *12.

## B. The Settlement was Substantively Fair and Adequate

According to the Division, the settlement is unfair and inadequate because it releases valuable claims in exchange for an amount that compensates the Class Members for only 4% of their total financial loss. "In evaluating the adequacy of a proposed settlement, the trial court should 'weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement.'" *Shenker*, 226 Md. App. at 688 (quoting *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983)). The trial court must consider the following factors:

33

> (1) [T]he relative strength of the plaintiffs' case on the merits,
> (2) the existence of any difficulties of proof or strong defenses
> the plaintiffs are likely to encounter if the case goes to trial, (3)
> the anticipated duration and expense of additional litigation,
> (4) the solvency of the defendants and the likelihood of
> recovery on a litigated judgment, and (5) the degree of
> opposition to the settlement.

*Id.* (quoting *In re Montgomery Cty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 316 (D. Md. 1979)).

In its Final Approval Order, the circuit court applied these five factors. The court noted that there were pending motions to compel arbitration, which represented a significant "procedural hurdle" if the class action proceeded to trial. The circuit court properly considered the importance of the Class Defendants' declining limits insurance policy in evaluating the likelihood of recovery on a litigated judgment. The record before the circuit court clearly demonstrated that the Class Defendants were paying defense costs through its insurance policy. Indeed, in the Final Approval Order, the circuit court recognized that while the insurance policy contained $1,000,000 in coverage, "the payment of defense costs erodes the amount of coverage provided by the policies, which diminishes payments to Class Members." The circuit court also acknowledged that the Class Action Defendants "[do not] have assets which would significantly increase the total settlement amount." In making this finding, the circuit court noted that Smith's only recoverable assets were $1,200 in a bank account and a Corvette that was inoperable. Additionally, the circuit court statedthat Mr. Sud "pled guilty to a crime, and is facing up to 5 years in prison and a $250,000 fine."

The circuit court also considered the Division's restitution claims in *CPD v. Access Funding* and assessed whether it could restore the Class Members' structured settlement payment rights. The court observed at the July 25, 2017 hearing that the Division faced "a high bar" in proving its restitution theory. At the fairness hearing, the circuit court questioned whether the Court of Special Appeals opinion in *LVNV Funding* permitted the Division's proposed collateral attacks on the enrolled judgments. As set forth *supra*, this Court subsequently vacated and remanded the Court of Special Appeals decision in *LVNV Funding*, leaving no doubt that the Division's collateral attack strategy fails as a matter of law. *LVNV Funding*, 463 Md. at 586. The circuit court also expressed appropriate concern about the Division's ability to "collect" on any judgments because the structured settlement rights had been subsequently purchased by third parties, who have substantial defenses. In my view, the circuit court correctly concluded in its Final Approval Order that the Division's "claim seeking to avoid [the transactions] . . . is far from certain. What is certain is that . . . litigation will continue, and that will deplete the Defendants' insurance policies."

The circuit court did not abuse its discretion in ruling that "the settlement is fair and adequate." The court held four lengthy hearings. It reviewed numerous substantive pleadings and legal arguments to determine whether the settlement was adequate, and applied the factors outlined above. The court considered and rejected the Division's argument during the settlement proceedings. The court properly found that the Class Defendants lacked the assets to contribute towards the settlement and that further litigation would deplete the insurance policy.

The Division further contends that the circuit court erred in disregarding whether Access's executives—Messrs. Jundanian, Borkowski, and Boghosian—had the financial wherewithal to contribute towards the settlement. In the Final Approval Order, the court declined to consider the three executives' finances, stating that these individuals are not "parties to this litigation, and thus, there is no basis for determining whether those individuals have assets." In considering whether a class action settlement is adequate, circuit courts consider, among other factors, "the solvency of the *defendants* and the likelihood of recovery on a litigated judgment." *Shenker*, 226 Md. App. at 688 (emphasis added). The circuit court did not abuse its discretion in declining to consider assets of non-parties.

In reviewing whether the amount of the settlement was adequate, the court considered the financial wherewithal of the Class Defendants and found that each defendant lacked assets of any significant value. The circuit court conducted this analysis by examining counsel for the Access Funding entities, and Messrs. Smith and Sud separately about each Defendants' assets. Moreover, the circuit court, the Division, and Class Counsel all received a copy of the spreadsheet identifying the funds remaining in the Access Funding entities' declining insurance policy in June 2017. If the Division believed that these figured were inaccurate, it had the ability to submit evidence to the contrary and declined to do so. In short, the circuit court conducted the proper analysis of the parties to the class action, assessed the assets available to fund the settlement, and reached the conclusion that the settlement was reasonable.

I agree with Judge Berger in his dissenting opinion, that "the trial judge did an exemplary job in conducting four comprehensive hearings to allow all parties to address the significant issues before the court." *Linton*, at \*22. The court ensured that notice of the proposed settlement was sufficient and that all prospective members of the Class received the notice. Additionally, the court considered the Division's objections—both in writing and at the hearings—and the court reviewed a multitude of pleadings in support of and against the settlement. The settling parties provided the court with the proposed order shortly prior to the February 2, 2018 fairness hearing. The court filed the Final Approval Order a week after the fairness hearing so that it could make an informed decision on the fairness, reasonableness, and adequacy of the settlement.

### C. The Circuit Court did not Abuse its Discretion in Awarding Attorneys' Fees

Finally, the Division contends that the circuit court abused its discretion in awarding Class Counsel $330,000 in fees. In the Final Approval Order, the circuit court explained its reasoning for the award:

> In complex cases such as this, the appropriate method to determine the amount of attorney's fees to be awarded is to utilize the percentage method. *See United Cable Tel. of Baltimore v. Burch*, 354 Md. 658, 686-87 (1999). As noted by one court, when attorney's fees are being paid from a common fund, "one-third has been held to be a fair and appropriate award" and is considered "typical and reasonable."
>
> . . . .
>
> The Settlement Agreement initially provided the Class Counsel would seek an award not to exceed thirty-three percent (33%) of the Settlement Funds, which would be an award of $363,000.

Class Counsel, however, is only seeking thirty percent (30%) of the Settlement Fund.

The Division argues that the circuit court abused its discretion in awarding fees to the Class Counsel because they did not conduct any discovery or perform any substantial work other than file the complaint. I disagree with the Division's position. In his dissenting opinion below, Judge Berger went through an exhaustive analysis of the evidence that was summarized by Class Counsel. *Linton*, at \*23. For example, Judge Berger noted that in an affidavit, Mr. Marshall averred that his law firm spent 359.8 hours on the class action litigation, which equaled $152,915 in total fees when accounting for each attorney's hourly billing rate. *Id.* In addition, Mr. Warnken provided in an affidavit that he had personally spent at least 163 hours on the case. *Id.* Mr. Warnken attested that he spent most of his time "researching the facts, the case, the parties and potential parties, and potential causes of action." *Id.* Mr. Warnken further provided in the affidavit that he "spent substantial time researching the individual actors involved in Access" and the effects of Mr. Jundanian's "prior bankruptcy filing" on the claims. *Id.*

In determining whether Class Counsel "have the experience and resource[s] necessary for adequate class representation[,]" the circuit court considered the qualifications of Brian Brown, Esq., Leah Barron, Esq., Byron Warnken, Esq., and Raymond Marshall, Esq. The circuit court observed that all of counsel for the Class demonstrated specialization in handling lead paint cases and the evaluation of the strengths and weaknesses of cases specific to this subject matter.

38

I agree with Judge Berger's well-reasoned dissent that the record clearly demonstrates that the circuit court carefully considered the merits of the award. The circuit court spent a considerable portion of the February 2, 2018 fairness hearing considering the various factors weighing in favor of and against a fee award. The court permitted the Class Counsel to argue why they were entitled to attorneys' fees. Thereafter, the court heard the Division's objections. Before rendering its decision, the court reviewed the submitted pleadings in addition to the affidavits and billing invoices that were included as exhibits to the pleadings. On this record, the circuit court did not abuse its discretion.

The Division claims that the award was improper because the court should have applied the "lodestar method" if the attorneys were even entitled to an award.[11] Maryland courts have "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to reasonable attorney's fees from the fund as a whole." *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 661 (2003) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). The lodestar method, which computes the billable hours by a reasonable rate, "is more commonly used in statutory fee shifting cases." *Id.*

The Division is correct that the lodestar method could have been applied. However, it was not an abuse of discretion for the trial court to use the percentage method. Class

---

[11] "The 'lodestar' approach calculates the attorneys' fees by multiplying the reasonable number of hours expended by the attorney on the litigation by a reasonable hourly rate and then to consider appropriate adjustments to the product of that multiplication." *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 673 n.14 (2003) (internal quotations and citations omitted).

Counsel performed significant work in obtaining the end result —a $1.1 million settlement, which is more than the amount available under the Class Defendants' insurance policy.

In my view, this case is a classic example of the important role of private counsel in civil matters. Class Counsel brought Access's scheme to the public's attention through its filing of the *Rose* litigation, and ensuing media attention. Class Counsel's prior litigation efforts contributed toward revisions to the Maryland Rules and the Maryland Structured Settlement Act that provided further protections for structured settlement transferors. The circuit court did not abuse its discretion in awarding attorneys' fees based upon a percentage method—a standard method of computing attorneys' fees in the American civil legal system.

In conclusion, I would affirm the judgment of the circuit court. I agree with Judge Berger that, consistent with "statutory authority and well-developed case law, the trial court did an excellent job of determining that the settlement was procedurally and substantively fair and did not abuse its discretion in certifying the Class." *Linton*, at *25. The circuit court did not abuse its discretion in approving the settlement, which was reached after a mediation with a senior judge with extensive experience. Both the Division and the CFPB declined invitations to attend the mediation. The Division was permitted to intervene. However, it did not undertake any discovery nor use its subpoena power to ascertain the availability of any additional assets. After conducting four extensive hearings and considering multiple objections from the Division, the circuit court issued a comprehensive memorandum opinion addressing each issue raised by the parties in this case. Under the

circumstances of this case, I do not find that the circuit court abused its discretion or otherwise erred as a matter of law in approving the settlement.

For all of these reasons, respectfully, I dissent. I would affirm the February 9, 2018 Final Approval Order of the Circuit Court for Baltimore City approving the settlement agreement.

Judge Hotten and Judge Getty have authorized me to state that they join in this opinion.