*Crystal Linton, et al. v. Access Funding LLC, et al.*, Case No. 1398, September Term 2020. Opinion by Nazarian, J.

**ARBITRATION – EXISTENCE OF AGREEMENT TO ARBITRATE**

The Plaintiffs were victims of lead paint exposure who had obtained structured settlements and the resulting stream of payments, after resolution of their tort claims. They entered into Purchase and Sale Agreements to transfer their rights to those payment streams to defendants. The Defendants moved to compel arbitration based on the arbitration clause in the Agreements. The complaint sufficiently alleged grounds for revocation of arbitration agreement where the clause expressly conditioned the obligation to arbitrate on the "closing" of the transaction and where valid court authorization of the transfer was statutorily required for the transaction to close (CJ § 5-1102). The Plaintiffs alleged that court authorization had been obtained fraudulently because the Defendants had defrauded not only the Plaintiffs but also the court in the course of obtaining its authorization. The line of cases following *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) did not drive the question of whether arbitrability should be decided by court or arbitrator because these Agreements were not entered into at arm's length, and the case was remanded for the court to determine arbitrability in the first instance.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1398

September Term, 2020

_____

CRYSTAL LINTON, ET AL.

v.

ACCESS FUNDING LLC, ET AL.

_____

Kehoe,
Berger,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  January 26, 2022

* Fader, C.J., did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Crystal Linton and Dimeca D. Johnson, and other putative class members, had obtained structured settlements, and the resulting stream of payments, after resolving their lead paint exposure claims. Ms. Linton, Ms. Johnson, and the others ("Plaintiffs") later signed Purchase and Sale Agreements ("Agreements") that purported to transfer their rights to those income streams to Access Funding LLC and/or affiliated entities ("Access")[1] in exchange for discounted lump sum cash payments. Ms. Linton and Ms. Johnson filed this action in July 2016, alleging claims of negligence, misrepresentation, fraud, and conspiracy in connection with those Agreements.

The Agreements contained arbitration clauses, and the Defendants filed petitions to compel arbitration in August 2016. But the circuit court never ruled on that first round of petitions because the parties undertook settlement negotiations. In or about March 2017, the Class Plaintiffs and the Defendants entered into a settlement agreement that the Circuit Court for Baltimore City approved on February 9, 2018. This Court reversed the approval,[2] and the Court of Appeals agreed,[3] so the case was remanded to the circuit court for further proceedings.

On remand, the Defendants filed renewed motions to compel arbitration that the circuit court granted. Ms. Linton and Ms. Johnson appealed, and we reverse and remand

---

[1] The Defendants before the circuit court are the appellees in this appeal: Access Funding, LLC, Access Holding LLC, Reliance Funding, LLC, Assoc., LLC, and En Cor, LLC ("Access"); Charles Smith and CES Law Group LLC ("Smith Appellees"); and Anuj Sud and SudLaw, LLC ("Sud Appellees").

[2] *Consumer Prot. Div. v. Linton*, No. 2609, Sept. Term 2017, slip op., 2019 WL 1770524 (Md. App. Apr. 22, 2019).

[3] *Linton v. Consumer Prot. Div.*, 467 Md. 502, 520–21 (2020).

for proceedings consistent with this opinion.

## I.     BACKGROUND

The factual allegations in the Complaint and procedural history were set forth in detail by this Court and the Court of Appeals in the earlier appeal. *Linton*, 467 Md. at 505–15; *Consumer Prot. Div. v. Linton*, No. 2609, Sept. Term 2017, slip op. at 2–9, 2019 WL 1770524 at *1–*4. We include a brief sketch of the background to provide context for the narrow question before us—whether this case must proceed to arbitration.

Ms. Linton and Ms. Johnson, on behalf of a putative class of plaintiffs, allege that the Defendants conspired to convince them to transfer their structured settlement annuity benefits to Access in exchange for unfairly discounted lump sum payments. Transfers of annuity benefits at a discount are not inherently improper, but under a statute enacted in 2000, the Structured Settlement Protection Act, any transfers must be authorized by a court.[4] Maryland Code (1973, 2020 Repl. Vol.), § 5-1102 of the Courts and Judicial Proceedings Article ("CJ"). Before authorizing such a transfer, the court expressly must find, among other things, that the transferor received "independent professional advice" about the transfer. CJ § 5-1102(b)(3). The Act defines "independent professional advice" as "advice of an attorney, certified public accountant, actuary, or other licensed professional adviser" who, among other things, "is not affiliated with or compensated by the transferee of the transfer." CJ § 5-1101(d), (d)(2). And during the times relevant to Ms.

---

[4] *See* James Gordon, *Enforcing and Reforming Structured Settlement Protection Acts: How the Law Should Protect Tort Victims*, 120 Colum. L. Rev. 1549, 1553 (October 2020) (observing that "[s]ince 1997, forty-nine states have passed some version of the Model Structured Settlement Protection Act").

Linton's and Ms. Johnson's transfers, "independent professional advice" was defined further to mean the advice of a professional "[w]ho is engaged by a payee to render advice concerning the legal, tax, and financial implications of a transfer of structured settlement payment rights."[5] 2000 Md. Laws Ch. 366.

---

[5] In 2016, after the events relevant to this case took place, the General Assembly amended the Structured Settlement Protection Act to institute greater protections for transferors of structured settlements, among them redefining "independent professional advice" from advice generally concerning "the legal, tax, and financial implications" of the transfer to advice concerning whether the transfer "would be in the best interest of the payee, taking into account the welfare and support of the payee's dependents." CJ § 5-1101(d)(1); 2016 Md. Laws Ch. 721; 2016 Md. Laws Ch. 722; *see also Linton*, 467 Md. at 527 n.4 (Booth, J., dissenting) (describing amendments to both the Structured Settlement Protection Act and the Maryland Rules that created greater protections for transferors of structured settlements and how the amendments were prompted in part by a *Washington Post* article describing another lead poisoning victim's complaint against Access).

The 2016 amendments also expanded the particular findings the trial court is required to make before authorizing the transfer. As enacted in 2000, CJ § 5-1102(b) required the court to make the following findings:

> (b) A structured settlement obligor or annuity issuer may not make any payment directly or indirectly to a transferee of structured settlement payment rights unless the transfer is authorized in an order of a court based on a finding that
>
>> (1) The transfer is necessary, reasonable, or appropriate
>>
>> (2) The transfer is not expected to subject the payee, the payee's dependents, or both, to undue or unreasonable financial hardship in the future;
>>
>> (3) The payee received independent professional advice regarding the legal, tax, and financial implications of the transfer; and
>>
>> (4) The transferee disclosed to the payee the discounted present value.

2000 Md. Laws Ch. 366.

In 2016, CJ § 5-1102(b) was amended to require the following more extensive

Continued…

"express" findings:

(b) A structured settlement obligor or annuity issuer may not make any payment directly or indirectly to a transferee of structured settlement payment rights unless the transfer is authorized in an order of a court based on express findings that:

(1) The transfer is necessary, reasonable, and appropriate and in the best interest of the payee, taking into account the welfare and support of the payee's dependents;

(2) The financial terms of the transfer agreement are fair to all parties, taking into account:

(i) The difference between the amount payable to the payee and the discounted present value of the payments to be transferred; and

(ii) The discount rate applicable to the transfer;

(3) The payee received independent professional advice concerning the proposed transfer; and

(4) At least 10 days before the date on which the payee signed the transfer agreement, the transferee provided to the payee a separate disclosure statement, in at least 14 point boldface type, that states:

(i) The amounts and due dates of the structured settlement payments to be transferred;

(ii) The aggregate amount of the payments to be transferred;

(iii) The discounted present value of the payments to be transferred;

(iv) The amount payable to the payee in exchange for the payments to be transferred;

(v) An itemized listing of all brokers' commissions, service charges, application fees, processing fees, closing costs, filing fees, administrative fees, notary fees, and other charges payable by the payee or deductible from the gross amount otherwise payable to the payee, except attorney's fees and related disbursements;

(vi) The transferee's best estimate of the amount of any attorney's fees and disbursements payable by the payee

Continued…

4

The parties don't dispute that the transfers were made pursuant to Purchase and Sale Agreements that Ms. Linton and Ms. Johnson (and others)[6] signed and that the transfers were contingent upon court authorization, as the Structured Settlement Protection Act requires. The Plaintiffs allege that after signing the Agreements, Access placed them in contact with an attorney, Charles E. Smith, who did not meet the "independent professional advice" requirement because he was affiliated with, and paid by, Access.[7] Mr. Smith then

     or deductible from the gross amount otherwise payable to the payee;

     (vii) The net amount payable to the payee after deduction of all commissions, fees, costs, expenses, and charges described in items (v) and (vi) of this item;

     (viii) The discount rate applicable to the transfer, which shall be disclosed in the following statement: "Based on the net amount that you will receive from us and the amounts and timing of the structured settlement payments that you are transferring to us, you will, in effect, be paying interest to us at a rate of __ percent per year.";

     (ix) The amount of any penalty or liquidated damages payable by the payee in the event of any breach of the transfer agreement by the payee; and

     (x) A statement that the payee has the right to cancel the transfer agreement, without penalty or further obligation, at any time before the transfer is authorized by a court under this subtitle.

[6] This Court's and the Court of Appeals's opinions indicate that there are approximately one hundred putative class members in total. *Linton*, 467 Md. at 508; *Consumer Protection Division v. Linton*, No. 2609, Sept. Term 2017, slip op. at 2, 2019 WL 1770524 at *1; *see also Linton*, 467 Md. at 528 (Booth, J., dissenting).

[7] This Court's and the Court of Appeals's opinions indicate that Access paid Mr. Smith more than $50,000 for his advice to the transferors, that Mr. Smith was close personal friends with the CEO of Access Funding, and that he had a close relationship with

Continued…

signed form letters falsely representing to the court that he had explained to the Plaintiffs fully the legal and financial implications of the transfer, and Access then submitted the letters to the court in support of its petitions for approval of the transfers.

With regard to arbitrability, the Plaintiffs allege that "[i]n using [] Mr. Smith," Access "sought to prevent Plaintiffs from fully understanding and appreciating the Purchase [A]greement's provision with respect to binding arbitration and/or limiting class action rights . . . ." The arbitration clause provided that, *after* the transaction closed—that is, after court authorization, among other preconditions—any claim or dispute arising from the agreement would be "resolved by mandatory binding arbitration."

In or about August 2016, the Defendants filed separate motions to compel arbitration; the circuit court later consolidated them. On September 28, 2016, the court stayed the case pending a ruling on the motion to compel arbitration. *See* CJ § 3-209. In the meantime, the parties negotiated a settlement with the assistance of mediation (and without any formal discovery), and on March 28, 2017, the parties filed a joint motion for preliminary approval of the settlement. While that motion was pending, on April 13, 2017,

---

Access Funding's former attorney, Anuj Sud, who is an appellee in this matter. *Linton*, 467 Md. at 506 n.1. Mr. Sud has since been disbarred. *Attorney Grievance Comm'n v. Sud*, 457 Md. 395 (2018).

In addition, Mr. Smith, Mr. Sud, and Raffi Michael Boghosian (a founder, part owner, and chief operating officer of Access) recently were charged in the Circuit Court for Baltimore City with Theft Scheme Over $10,000 and Conspiracy to Commit Theft Scheme Over $100,000. Press Release, Office of the Attorney General, *Attorney General Frosh Announces Indictments of Three Individuals Relating to Access Funding* (December 21, 2021), https://www.marylandattorneygeneral.gov/press/2021/122121.pdf

6

the Consumer Protection Division of the Office of the Maryland Attorney General (the "Division") moved to intervene in the case. The parties opposed the motion to intervene jointly, but the circuit court granted it on June 8, 2017.

The Division had filed a separate enforcement action relating to Access's alleged wrongdoing (as had the Federal Consumer Financial Protection Bureau (the "Bureau")). *Linton*, 467 Md. at 507; *see also id.* at 528–29 (Booth, J., dissenting) (describing in detail the Division's action, which sought civil penalties, injunctive relief, monetary restitution, as well as to void the judgments approving the transactions). The Division's action, filed under the State Consumer Protection Act (Maryland Code, Commercial Law Article ("CL"), Title 13), alleged that in soliciting and consummating the transfers, Access had engaged in unfair or deceptive trade practices in violation of CL § 13-303. *See id.* The Division sought civil penalties on Access; to have the court enjoin Access from continuing their alleged misconduct; to restore to the transferors the future payment streams; and to obtain restitution and disgorgement from Access. *See id.* As an intervenor, the Division opposed the motion to approve the class action settlement. But after holding a hearing, the circuit court granted the motion for approval on February 13, 2018.

The Division appealed the circuit court's approval to this Court. In an unreported opinion filed on April 22, 2019, and with one judge dissenting, we affirmed in part and reversed in part. *Consumer Prot. Div. v. Linton*, No. 2609, Sept. Term 2017, slip op. We held, among other things,[8] that the settlement was improper because it would interfere

---

[8] We also addressed Access's cross-appeal concerning the Division's intervention and

Continued…

impermissibly with the Division's (and the Bureau's) enforcement authority by assigning the Plaintiffs' right to recover any restitution those government agencies might collect back to Access:

> The point of settlements is to settle, and the Class Action Defendants understandably sought in this agreement to achieve total peace. But parties can only settle their own claims—they can't settle the claims of those who aren't parties to the agreement or otherwise not theirs to settle. The Division and the Bureau weren't parties to the settlement and their rights to seek restitution was not something the Class could bargain away. And because the settlement effectively preempted a major portion of the pending claims being pursued by the Division and the Bureau when it assigned any benefit from those actions to Access and the Class Defendants—*i.e.*, the targets of the agencies' enforcement efforts—the judgment approving the settlement must be reversed.

*Id.* at 13, 2019 WL 1770524 at \*6.

Both Access and the Division filed petitions for *certiorari* and the Court of Appeals granted them. In vacating this Court's judgment and remanding the case to circuit court, the Court of Appeals agreed with our conclusion that the settlement was improper because the parties had no authority either to direct that any recoveries achieved from restitution and disgorgement be handed over to Access (or to anyone else) or otherwise to preclude the Division from pursuing its own remedies.[9] *Linton*, 467 Md. at 521.

---

held that the circuit court properly allowed the Division to intervene. *Consumer Prot. Div. v. Linton*, No. 2609, Sept. Term 2017, slip op. at 12–13, 2019 WL 1770524 at \*6. We held as well that the settlement was procedurally fair but declined to address whether it was substantively fair. *Id.*, slip op. at 21, 28, 2019 WL 1770524 at \*10–\*12.

[9] The Court of Appeals also held that the question whether the settlement was procedurally or substantively fair was moot, and it declined to address the merits of those issues. *Linton*, 467 Md. at 521.

8

The Court remanded the case to the circuit court and concluded with three additional observations. *First*, the Court observed that if the parties were to attempt to settle the case anew, the circuit court should consider evidence of the Defendants' financial status (regarding which no discovery had yet been conducted) and their ability to pay. *Id.* at 521. *Second*, the Court commented in *dicta* that the circuit court should reconsider its grant of partial summary judgment against the Division in the separate enforcement action.[10] *Id.* at 521. *Third*, and finally, the Court suggested that the circuit court should consider whether Access had waived any right it may have had to arbitration through its participation in the litigation:

> If the case reaches that stage, the court will need to consider . . . whether, by participating in the litigation of this case for three-and-a-half years, most of which was taken up negotiating and defending a settlement of the litigation, Access has waived any right it may have had to arbitration. *See Charles J. Frank, Inc. v. Jewish Ch.*, 294 Md. 443 (1982); *Cain v. Midland Funding*, 452 Md. 141 (2017).

*Id.* at 521–22.

On remand, the parties did not pursue settlement again. Instead, after an August 27, 2020 status conference, the circuit court ordered the Defendants to file renewed motions to compel arbitration, and Access, the Sud Appellees, and the Smith Appellees all filed

---

[10] According to the Court of Appeals's opinion, the circuit court had granted partial summary judgment in favor of the defendants on the Division's disgorgement/ restitution claims on *res judicata* grounds because of the settlement agreement's provisions precluding the Division from pursuing those remedies. *Linton*, 467 Md. at 514. But the court had permitted the Division's claims for injunctive relief and civil penalties to proceed. *Id.* At the time the Court of Appeals filed its decision, the Division's case was awaiting trial. *Id.* We have no information about the current status of that case.

separate motions that the Plaintiffs opposed jointly. After a hearing on December 15, 2020, the circuit court issued a memorandum opinion and order granting the motions to compel arbitration and staying the proceedings. The court addressed three separate issues. *First*, it held that the arbitration clause required that "arbitrability in this case must be determined by an arbitrator and not the court." *Second*, it held that all of the Defendants, even those not parties to the Purchase and Sale Agreements (*i.e.*, the Smith defendants), had standing to invoke the arbitration clause. And *third*, it held that the Defendants had not waived their right to enforce arbitration. Only the first holding is at issue in this appeal.

We supply additional facts as necessary below.

## II.    DISCUSSION

Ms. Linton and Ms. Johnson identify two questions on appeal that boil down to whether the circuit court erred in compelling arbitration.[11] We hold that it did.

---

[11] Ms. Linton and Ms. Johnson phrase the Questions Presented as follows:

> 1. Did the circuit court err in concluding that the arbitrability of the dispute in this case must be determined by an arbitrator and not the court?

> 2. Whether enforcement of the arbitration clause of the Purchase Agreement violates Maryland public policy as reflected in Maryland's Structured Settlement Protection Act and Maryland Court Rules because Appellants did not receive the statutorily required independent professional advice due to Appellees' fraudulent scheme to deprive them of receiving it?

The Defendants break down the Questions Presented into four:

> 1. Did the Circuit Court correctly rule under Federal and Maryland law that the issue of arbitrability is to be decided by the arbitrator, and not the Court, where Appellants executed Purchase and Sale Agreements containing arbitration clauses

Continued…

10

"Arbitration is the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them." *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103 (1983). Arbitration is a matter of contract, and parties should be allowed to conduct arbitration in accordance with their agreement. They likewise should not be required to submit any dispute to arbitration that they have not agreed to submit. *Id.*

The arbitration clause at issue here states expressly that it was "made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act," and the parties do not dispute that our analysis begins with the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq. See Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 541 (1994) (stating that state courts "rely on decisions interpreting the Federal Arbitration Act" in resolving disputes over arbitration). Section 2 of the FAA provides that agreements to

that expressly stated that the arbitrator shall decide the arbitrability of a dispute between the Parties, and where Appellants alleged fraud and misrepresentation as to the Purchase and Sale Agreements as a whole and not with respect to the arbitration clause separately and specifically?

2. Did Appellants waive their argument that the Circuit Court violated Maryland public policy by failing to raise this new issue below in the Circuit Court?

3. If Maryland public policy would prevent enforcement of the arbitration agreements, does the FAA preempt that public policy?

4. Was the Circuit Court's ruling that the subject arbitration provision is enforceable and that this dispute should be resolved via arbitration, as the Parties[] agreed, consistent with public policy?

arbitrate are "valid, irrevocable, and enforceable."[12] In enforcing section 2, though, state courts are not bound by the federal procedural provisions of the FAA and may apply their own procedures. *Walther v. Sovereign Bank*, 386 Md. 412, 423 (2005) (*citing Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984)).

The Maryland Uniform Arbitration Act ("Maryland Arbitration Act"), CJ § 3-201, *et seq.*, enacted in 1965, "was purposefully meant to mirror the language of the FAA." *Id.* at 423–24. Like the FAA, the Maryland Arbitration Act, "embodies a legislative policy favoring enforcement of executory agreements to arbitrate." *Gold Coast Mall*, 298 Md. at 103. The Act's § 3-206(a) mirrors the FAA's Section 2 in providing that a written agreement to arbitrate is "valid and enforceable" and "irrevocable" unless there are grounds to revoke the agreement.[13]

---

[12] Section 2 provides in full:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

[13] CJ § 3-206(a) is consistent with the FAA's § 2:

> Except as otherwise provided in this subtitle, a written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid

Continued…

The Arbitration Act goes on in CJ § 3-207 to allow a party to petition a court to compel arbitration and requires the court to deny the petition if it determines that the arbitration agreement doesn't exist:

> (a) If a party to an arbitration agreement described in § 3-202 of this subtitle refuses to arbitrate, the other party may file a petition with a court to order arbitration.
>
> (b) If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.
>
> (c) If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

"The trial court's decision as to whether a 'particular dispute is subject to arbitration is a conclusion of law, which we review *de novo*.'" *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 588 (2006) (*quoting Walther*, 386 Md. at 422).

The Defendants moved to compel arbitration based on the arbitration clauses in Ms. Linton's and Ms. Johnson's signed Purchase and Sale Agreements. The Agreements contained identical arbitration clauses that provide, among other things, that, "[o]nce your transaction has closed," any claim "arising from or relating in any way to this Agreement" shall be resolved by arbitration:

> 8.17 <u>Arbitration Clause</u>. **Once your transaction has closed, any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents, successors or assigns of the other, arising from or relating in any way to this Agreement or any prior agreement** (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief) including

> and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract.

13

Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement or any prior agreement, shall be resolved by mandatory binding arbitration. For matters that could be brought in your local small claims court, you have the option of proceeding in the small claims court rather than proceeding in arbitration. This arbitration provision cannot be used to bypass state and federal laws requiring court approval of this transaction. . . .

(Emphasis added.)[14] The Agreement defines "closing" to occur "after" entry of an order of

---

[14] The clause goes on to outline the arbitration procedures—it incorporates the rules of the arbitration company (JAMS Arbitration) and states that Ms. Linton and Ms. Johnson are precluded from acting as class representatives or otherwise participating in a class action:

The arbitration shall be conducted by JAMS Arbitration ("JAMS") under the Code of Procedure in effect at the time the Claim is filed. JAMS Rules and forms may be obtained and Claims may be filed at any JAMS office, online at www.jamsadr.org, or by telephone 1-800-352-5267. You will have the right to counsel, the right to be heard in front of a neutral arbitrator, and you will have the opportunity to participate in the selection of the arbitrator. You will retain all the remedies that you are afforded under local, state and federal law. The arbitration shall take place in your hometown or, in the JAMS office closest to where you are located. The arbitrator shall apply the law of the jurisdiction where we sought approval of this Agreement. We or you may, upon approval of the other, substitute another nationally recognized, independent arbitration organization that uses a similar code or procedure. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-15–16 ("FAA"). Any arbitration award shall be final, and judgment upon the award may be entered in a court having jurisdiction. No Claim submitted to arbitration is heard by a jury, and no Claim may be brought as a class action or as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimant with respect to any Claim.

14

approval "by a court of competent jurisdiction in accordance with an applicable state transfer statute of a state of the United States of America."

The court's task on a petition to compel arbitration is narrow—it determines only whether a valid arbitration agreement exists. *Baltimore Cnty. Fraternal Ord. of Police Lodge No. 4 v. Baltimore County*, 429 Md. 533, 550 (2012) (*quoting Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 378 Md. 139, 155 (2003)) ("'[C]ourts are limited to determining only one thing: whether a valid arbitration agreement exists' and must be careful not to 'stray into the merits of any underlying agreements.'").

In this case, the circuit court didn't phrase the issue or its holding in those terms. Instead, it phrased the issue as "whether the agreement to arbitrate should be determined by an arbitrator or the court," and ruled that "arbitrability in this case must be determined by an arbitrator and not the court." But in using the term "arbitrability," the court (and the parties) conflate two separate issues: *first*, whether there is an agreement to arbitrate at all and *second*, whether a particular dispute falls within the scope of an arbitration agreement. The *first* question is always for the court, and not the arbitrator, to decide. *See Baltimore Cnty. Fraternal Ord. of Police Lodge No. 4*, 429 Md. at 550. The *second* question, if in dispute, may be decided by the court or the arbitrator, depending on the circumstances. *Allstate Ins. Co. v Stinebaugh*, 374 Md. 631, 643 (2003) (*citing Gold Coast Mall*, 320 Md. at 104, 107). Here, the second question—the scope of the clause—is not at issue. Instead, the dispute centers around the existence of the arbitration agreement itself.

The parties' arguments in this case flow from a line of cases originating with the United States Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg.*

15

*Co.*, 388 U.S. 395 (1967), and followed by the Court of Appeals in *Holmes*, 336 Md. at 546–47. In *Prima Paint*, Flood & Conklin ("Flood") entered into an agreement with Prima Paint that contained an arbitration clause. *Prima Paint*, 388 U.S. at 397–98. Later, Prima Paint notified Flood that it believed Flood had breached the agreement by representing fraudulently that it was solvent when in fact it was insolvent. *Id.* at 398. Prima Paint filed suit, Flood sought to proceed to arbitration, and the trial court stayed the action pending arbitration. The Supreme Court held that because Prima Paint had not alleged that Flood induced it fraudulently into the agreement to arbitrate in particular, arbitration should proceed. *Id.* at 406. The Supreme Court relied on § 4 of the Federal Arbitration Act, which the Maryland Arbitration Act's § 3-207 mirrors, and which provides that upon being satisfied that the formation of the arbitration agreement is not in issue, the court shall direct arbitration to proceed:

> Under §4, with respect to a matter within the jurisdiction of the federal courts save for the existence of an arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that "the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue." Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it.

*Prima Paint*, 388 U.S. at 403–04 (brackets in original) (footnote omitted).

In *Holmes*, a janitorial supplies franchise ("Coverall") informed its franchisee (Mr. Holmes), that it was terminating the franchise agreement due to Mr. Holmes's mismanagement. 336 Md. at 538. In response, Mr. Holmes filed a complaint against Coverall that alleged claims of fraud in the inducement, negligent misrepresentation,

professional malpractice, and a violation of the Maryland Franchise Act. *Id.* at 537–38. The claims were based primarily on Coverall's failure to obtain authorization under the Franchise Act to sell franchises in Maryland. *Id.* at 538. Mr. Holmes opposed Coverall's petition to compel arbitration and argued that the franchise agreement should be rescinded due to Coverall's fraud and Franchise Act violations. In other words, Mr. Holmes argued that the franchise agreement (including its arbitration clause) was void at its inception, and that the merits of the fraud and statutory claims were a threshold issue to be resolved by the court. *Id.* at 537–38.

Relying on *Prima Paint*, the Court of Appeals disagreed and held that the arbitration clause was valid and that the merits of the dispute—including the question of whether the contract as a whole was void because of the franchisor's alleged fraud—must be submitted to the arbitrator. *Id.* at 542–44, 547. The Court reasoned that because arbitration agreements are severable from the contracts that include them, they are "enforceable independently from the contract as a whole." *Id.* at 545 (citations omitted). Accordingly, where the plaintiff does not allege "fraud in the inducement as to the arbitration clause itself," resolution of "the underlying dispute is [] for the arbitrator." *Id.* at 547.

The Defendants argue that this case is exactly like *Prima Paint* and *Holmes*. They contend that the circuit court did not err in compelling arbitration because the Plaintiffs do not allege that the arbitration clause itself, and specifically, was obtained by fraud but instead allege that the whole of the Purchase and Sale Agreements were obtained by fraud.

Plaintiffs analogize to *Holmes* and *Prima Paint* as well, but from a different angle— they argue that compelling arbitration here is inconsistent with the holdings of those cases.

17

In the first instance, they note that they do allege that the arbitration clause itself was obtained by fraud, and thus that this case falls within the exception recognized in those cases. The Plaintiffs point to Paragraph 81 of the Complaint, in which they allege that by referring Ms. Linton and Ms. Johnson to Mr. Smith for independent professional advice, Access sought to prevent them from fully understanding both the general consequences of the transfer and the arbitration clause in particular:

> 81. In using Defendant Charles Smith, Defendant Access Funding not only ensured that its customers would not receive true independent professional advice, but it also sought to prevent Plaintiffs from fully understanding and appreciating the Purchase [A]greement's provision with respect to binding arbitration and/or limiting class action rights, which were not in the Plaintiffs' best interests.

To the extent that Paragraph 81 does not allege facts to support fraudulent inducement specifically as to the arbitration clause, the Plaintiffs argue in the alternative that their general allegations of fraud are sufficient. They contend that the clause's express terms requiring that it only goes into effect "[o]nce your transaction has closed . . ." had the effect of overriding the presumption that the arbitration agreement was separable from the whole Agreement. *See Holmes*, 336 Md. at 544 (emphasis added) (*quoting Pinkis v. Network Cinema Corp.*, 512 P.2d 751, 757 (Wash. App. 1973)) ("'Agreements to arbitrate are separable from the contracts in which they are placed *unless the parties have expressed a contrary intention.*'"). Therefore, they say, *Prima Paint* and *Holmes* apply to require the court to determine the enforceability of the whole Agreement, including the arbitration clause.

But the *Prima Paint* and *Holmes* line of cases proceed from the premise that the

18

underlying agreement and the arbitration clause were entered into at arm's length. That isn't the case here, nor could it be—by statute, the Agreements weren't, and couldn't be, arm's-length agreements because they aren't effective unless and until the circuit court approves the transfers. And the Plaintiffs' claims here allege negligent misrepresentation and fraud directed not only at the Plaintiffs but—importantly—at *the court*.[15] Not only was the court's authorization required by statute for the metaphorical meeting of the minds to ripen, but the court's authorization also was required, under the express terms of the arbitration clause, for the arbitration obligation to arise in the first place. For those reasons, then, *Prima Paint* and *Holmes* don't drive our analysis of whether the arbitration clause came into being.

We look instead to first principles, as embodied in the Maryland Arbitration Act. Under CJ § 3-206(a), "a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." The Plaintiffs have alleged grounds at law or in equity to rescind these contracts: the Agreement expressly conditioned the obligation to arbitrate on the "closing" of the transaction, both the Agreement and the Structured Settlement Protection Act required valid court authorization for the "closing" of the transaction to take place, and the Plaintiffs

---

[15] For instance, Plaintiffs allege that "Defendants misrepresented to the courts . . . that independent professional advice regarding the transfer agreement had occurred" and that "[t]he courts approved the transfers based on false information." Plaintiffs also allege that the courts would not have approved the transfers had the courts known that no independent professional advice had been provided to the Plaintiffs.

have alleged that the Defendants committed fraud in the course of gaining the circuit court's approval of the transfers. As such, they have denied the existence of a valid arbitration agreement, and that puts to the *court*, not the arbitrator, the question of whether the arbitration agreement exists. CJ § 3-207(b) ("If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists."). The merits of that question are for the court to decide, *see* CJ § 3-207(c) ("If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition."), and we express no views on how the court should decide them. We hold, however, that the circuit court erred in compelling arbitration of the threshold question of whether the arbitration clause exists.

To be sure, this case presents an unusual application of these arbitration principles, but we see an analogy in a case the Plaintiffs cite, in which the United States Court of Appeals for the Tenth Circuit held that *Prima Paint* did not apply and the trial court correctly denied a motion to compel arbitration. In *Spahr v. Secco*, the plaintiff, an elderly man, alleged that one of the company's stockbrokers had deceived him into handing over to her large sums of money. 330 F.3d 1266, 1272 (10th Cir. 2003). He asserted that the arbitration agreement contained in the share purchase agreement was not enforceable because he had insufficient mental capacity to understand the nature and effect of the whole agreement. *Id.* at 1268. *Spahr* reasoned that a mental capacity challenge, by definition, "can logically be directed only at the entire contract"—in other words, "it would be odd indeed if a party claimed that its mental incapacity specifically affected the agreement to arbitrate." *Id.* at 1273. So too here. In this case, the Plaintiffs allege that the Defendants

20

interfered fraudulently with the court's statutory obligation to find, as a condition of approving the transfers, that a professional who was not affiliated with the Defendants provided advice "concerning the legal, tax, and financial implications" of the transfer, 2000 Md. Laws Ch. 366, which necessarily include the implications of agreeing to arbitrate. So just as *Prima Paint* did not apply in *Spahr*, it does not apply here, and the express language of the arbitration clause conditioning the arbitration agreement on the closing of the transaction reinforces that conclusion.[16]

Compelling arbitration in this case effectively would allow the Defendants to circumvent the court authorization process mandated by the Structured Settlement Protection Act. Put another way, allowing the dispute about the validity of the court's authorization to be decided by the arbitrator would be the same as allowing Access to avoid the court at the very stage in the process where the General Assembly required the court's approval. CJ § 5-1102. Indeed, the arbitration clause states expressly that it is *not* to be used for that purpose: "[t]his arbitration provision cannot be used to bypass state and federal laws requiring court approval of this transaction." And other courts have held that

---

[16] Ms. Linton and Ms. Johnson argue also that the arbitration clause should not be enforced because it "contravenes" the public policy behind the Structured Settlement Transfer Act. They point to the 2016 amendments to the Act and the Maryland Rules, which sought to enhance procedural protections surrounding the transfer of structured settlement payment streams. But we cannot see in the record that such a "public policy" argument was raised in the circuit court—Ms. Linton and Ms. Johnson did not include any public policy argument in their opposition to the Defendants' motions to compel, and the transcript pages they cite in their briefs don't reveal that argument either. We decline to exercise our discretion to consider this argument in the first instance on appeal, Md. Rule 8-131(a), but that doesn't preclude Plaintiffs from raising it in the circuit court on remand.

companies seeking to avoid the statutorily-required court authorization process via arbitration cannot do so. *E.g.*, *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 599 F. Supp. 2d 809, 826 (S.D. Tex. 2008) (granting permanent injunction against factoring company to prevent use of arbitration process "to effect a transfer of an individual's future-payment rights when that transfer has not been approved as required under the applicable state structured settlement protection act"), *aff'd* 567 F.3d 754 (5th Cir. 2009).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEES TO PAY COSTS.**